# Wheeling.

BOUGHNER *v.* THE TOWN OF CLARKSBURG *et al.*

Decided July 9, 1879.

1879
June Term.

1. Courts of equity will restrain by injunction a town from constructing pavements on a person's land, where he has not dedicated the ground to public use, or where the ground has not been condemned according to law, for that purpose.

2. The principles as laid down in *Pierpoint* v. *Town of Harrisville,* 9 W. Va. 215, as to the dedication of land to public use for a street, are equally applicable to the dedication of land to public use for sidewalks or pavements in towns.

3. Where the dedication is on condition, the terms of the dedication must be strictly complied with.

Appeal from and *supersedeas* to a decree of the circuit court of the county of Harrison, rendered on the 22d day of January, 1876, in a cause in said court then pending, wherein Daniel Boughner was plaintiff, and The Trustees and Commonalty of the Town of Clarksburg and others were defendants, granted upon the petition of said Boughner.

Hon. C. S. Lewis, late judge of the second judicial circuit, rendered the judgment appealed from.

MOORE, JUDGE, furnishes the following statement of the case :

This cause is presented upon an appeal from and *su-*

*persedeas* to a decretal order, made in vacation, January
22, 1876, by Hon. C. S. Lewis, judge of the second judicial
circuit, dissolving an injunction granted said Boughner
November 13, 1875, upon a bill filed by him against said
defendants, to enjoin and restrain the defendants, &c.,
from building, erecting and constructing a certain pave-
ment in the bill mentioned.

The bill alleges that plaintiff is the owner and seized
in fee of two certain lots on Main street, in the town of
Clarksburg, upon which lots he has erected storehouses
in which he is now doing business as a merchant, which
lots were conveyed to him, &c.; that the trustees and
commonalty of the town of Clarksburg, by its officers
and agent, and employes, without the consent of plain-
tiff, and without having first condemned the ground on
the said lots in the manner provided by law, are now,
to-wit, on this 13th day of November, 1875, building,
erecting and constructing on the south side of his
said lots, and entirely on the said lots, on the north side
of Main street, immediately west of one of his said store-
houses, in the said town of Clarksburg, a brick pave-
ment; that said pavement, if permitted to be constructed,
will entirely prevent the plaintiff from passing into his
said lots to reach his said storehouses with his horses and
wagons, as he hath hitherto been accustomed to do, and
will greatly injure his business as a merchant. He
further alleges that said trustees and commonalty of
Clarksburg, refuse to make a crossing for horses and
wagons across said pavement, if the same is erected, so
that the plaintiff can cross and recross as he has hitherto
been accustomed to do; the plaintiff therefore prays that
the said trustees, &c. be enjoined and restrained from
building, erecting and constructing said pavement on his
said lots until they have condemned said ground upon
said lots upon which they are erecting and constructing
said pavement in the manner prescribed by law, and
make a crossing for horses and wagons for the plaintiff
over said pavement to pass into and from said lots, &c.

1879
June Term.

Boughner
v.
The Town of
Clarksburg et al.
The defendants, the trustees and commonalty, &c., answered the bill, and admit that plaintiff owns in fee simple the lots set out in the bill, but insists that all the ground on which the pavement is being laid, is not included in the lines of the said lots. In other words they answer, admitting they did direct the street commissioner in November, 1875, to construct the pavement on the north side of Main street, and on the south side of plaintiff's lot,- from the southwest corner of said lot to the southeast corner of the lot owned by Holmes, and that said pavement was ordered to be laid and constructed without the consent of plaintiff. That the length of the proposed pavement is forty-one feet, and that plaintiff prevented them from proceeding with the work.

"Further answering, the defendants deny that the plaintiff has any right to obstruct or prevent the laying of said pavement, or that the same, if laid, will interfere with any right of the plaintiff, or take any ground, or any part of said lot, to the use of which the public are not entitled. In other words, the defendants deny that the plaintiff has any right, under any pretense of title to the same, to prevent or obstruct the building of said pavement, or to deny to the public, the town of Clarksburg, the use of the ground proposed to be taken for the same. If the plaintiff's pretensions were true even, and his denial of the right on the part of the town of Clarksburg to the use of said ground were well founded in fact, defendants insist and charge that his right to withhold such use could extend only to the ground embraced in the boundaries of his alleged title, and that outside of his pretended claim of title is a strip of ground over which it was proposed to lay and build said pavement, and the building upon which he unlawfully obstructed and prevented, that does not belong to him but to the public, and the right to control which belongs exclusively to these defendants.

"But the defendants, further answering, aver and charge that whatever rights the plaintiff might have had

1879
June Term.

Boughner
v.
The Town of
Clarksburg et al.

in said premises, so far as the exclusive right to use the same is concerned, have been surrendered by his own acts and conduct by a dedication of said ground to the public; that several years ago, perhaps in the year 1872, and prior to the erection of the brick storehouse now occupied by plaintiff and located on said lot, the plaintiff, in contemplation of the building of the same, and recognizing the power and authority vested by law in the defendants in respect to the erection of buildings within said town, and the regulation of streets, pavements, sidewalks and alleys, made a written application to the then trustees and commonalty of the town of Clarksburg, to establish officially the grade for sidewalks on both Main and Third streets, and also for an establishment of street lines, and for the usual permit and privilege to build on said streets; upon which application, the said trustees, &c., proceeded to establish the grades and lines of streets as aforesaid, and said plaintiff, in the erection of his said storehouse, conformed to the lines and grades on said street as thus established, as these defendants are informed and believe. A copy of said application in writing is here filed marked "A."

"Further answering, defendants aver and charge that on the — day of ———, 187–, the said plaintiff asked and obtained permission to build and lay a pavement on the south side of his said storehouse, on Main street, on the north side of said street, from the southeast corner of said storehouse to the northwest corner of the same, and that he was allowed for building said pavement a credit on his taxes levied and collected by said town; and that from the time of the building of said pavement until recently, when said plaintiff unlawfully and in defiance and contempt of the authority and power of defendants erected a fence or rack on the south side of the same, the public have used and enjoyed the same. Defendants charge that by the repeated acts of plaintiff, the said ground has been dedicated to the public, and that he has no right to obstruct them in the use and

enjoyment of the same, or to prevent these defendants, or their employes, from laying a pavement thereon for the use and convenience of the public.

"Further answering, defendants deny that the building of said pavement will in anywise prevent or hinder the plaintiff from passing into his said lot to reach his storehouse in a proper manner with vehicles, horses, &c. Plaintiff has been passing in said lot over said pavement so far as laid, and with an impunity of boldness that defies authority.

"Further answering, defendants say that it has not been usual for them to lay and build crossings on pavements for the benefit of private individuals, and that they did not refuse to put in a crossing for said plaintiff as he alleges, as he never gave them the opportunity to either refuse or grant such privilege by making application for the same."

To the said answer plaintiff replied generally. Exhibits were filed with the bill and answer, and depositions were taken by both parties, which are sufficiently stated in the opinion, and therefore need not be set out in this statement.

*E. Maxwell,* for appellant, cited the following authorities:

2 Tucker 469; 4 Johns. 55; Williams on Injunctions p. 360, §6; *Id.* p. 567, §26; Kerr on Injunctions 296; 20 Gratt. 833; 8 Gratt. 636; 2 Waterman on Trespass 67; 2 Dillon on Corporations 598, ch. 17, §495.

*Thomas W. Harrison,* for appellee, cited the following authorities:

2 Rob. (Old) Pr. 165, 166, 231, 233; Dillon Mun. Corp. 677; 4 W. Va. 599; 1 Hild. Torts 550; 9 W. Va. 215; 12 W. Va. 36.

MOORE, JUDGE, delivered the opinion of the Court:

The first question presented in this case is: Had the court jurisdiction to restrain the Town of Clarksburg by

injunction from constructing the pavement? The appellees insist that injunction was not the proper remedy but that the plaintiff should seek redress by action at law. The doctrine has been settled in this State, by the case of *Pierpoint* v. *The Town of Harrisville*, 9 W. Va. 215, that "an injunction will lie to restrain a town, from opening streets through a person's land, without first condemning it according to law, when there has been no dedication of such streets to public use." because the redress at law is utterly inadequate. Upon the same principles, courts of equity will restrain by injunction a town from constructing pavements on a person's land where he has not dedicated the ground to public use, or where the ground has not been condemned according to law, for that purpose.

It is insisted by the appellees that in this case the plaintiff dedicated the ground, on which the pavement is proposed to be laid, to the public.

The doctrine is also established, in this State, by the case of *Pierpoint* v. *The Town of Harrisville*, that, "Where there has been no public use of a street, the owner may dedicate his land to the public for such use *by acts and declarations,* without a deed. But in such a case, these acts and declarations must be *deliberate, unequivocal, and decided, manifesting a positive, and unmistakable intention to permanently abandon his property to such public use.*"

Under the same principles the owner of lands may dedicate or set apart to the public use for a pavement such part of his lands as he pleases to do, and if the dedication be accepted, it will work an estoppel *in pais,* precluding the owner from asserting any right inconsistent with such use. But, as stated in *Holdane* v. *Trustees of Village of Cold Spring*, 21 N. Y. 477, and cited by Judge Green in *Pierpoint* v. *Town of Harrisville*, "the dedication and acceptance are to be proved, or disproved, *by acts of the owner.* Both are questions of intention."

Was it the intention of the plaintiff to dedicate the ground as is alleged in the answer? Turning to the acts

1879
June Term.

Boughner
v.
The Town of
Clarksburg *et al.*

Syllabus 1.

Syllabus 2.

and declarations of the plaintiff to prove that he intended such dedication, the appellees point to Exhibit A. filed with their answer, which is as follows:

"CLARKSBURG, W. VA., April 12, 1872.

"*To the Mayor and Town Council of Clarksburg:*

"GENTLEMEN: With the intention of building upon our lot on the northwest corner of Main and Fourth streets, we hereby apply for an official establishment of the grades for sidewalks on both streets; also for an indication of street lines. We also ask for the usual privileges of builders upon the streets.

"Very respectfully,

"D. BOUGHNER & SON."

It also appears from an authenticated copy of the minutes of the town council of Clarksburg for April 12, 1872, that "D. Boughner & Son made application in writing for permission to erect a brick building on the northwest corner of Main and Fourth streets; also to have the grade of the street established. Was granted."

Werninger testifies that he was mayor of Clarksburg at the time the aforesaid application was made by D. Boughner & Son.

To the defendants question.—"Who was the street commissioner at the time said application was made, and what action, if any, was taken in reference to fixing the grades of sidewalks on said streets, and the indication of such street lines?

"Answered—William R. Alexander was the street commissioner. I know that on Main street there was action taken to fix the lines; I assisted William R. Alexander, as the street commissioner, in doing it; it was done at the time that we graded Main street, near the mouth of Fifth street. I think I had a conversation with Mr. Boughner a time or two during the time Mr. Alexander was at work on said street. Whilst at work at it, I became satisfied that Mr. Boughner and all the lot owners on the north side of Main street from

Fourth west were on the street; that their fences were out on the street. In a conversation I had with Mr. Thorn, I told him that I was satisfied he was four or four and one-half feet on the street, and perhaps, by a true measurement, was more. I suggested to him that he had better throw his fence back about six feet, and that if we were wrong, he had his remedy; that he could go for damages if they had done anything wrong. He said that if we would move his fence back at our own expense on the line suggested, there was an end of it; that he would charge no damages; and we did so; the corporation put up the fence. I do not recollect as to Mr. Goff's with certainty, but my impression is, that he moved back. At all events it was moved back, and the corporation may have done it; so far as Mr. Boughner was concerned, I think the most of his fence was torn down. It was a place for hitching horses, and I think it was mostly torn down. There was dirt hauled there to grade the sidewalks, as near as we could with the naked eye. I think Mr. Alexander hauled some dirt inside the lot. This was before the erection of the brick building that now stands on the lot.

"Question by same—State if you please whether the brick building erected on said lot stands on Main street in conformity with or about on the line indicated by you and Mr. Alexander, as you have stated.

" Answer—That part of brick building fronting on Main street is as near on the line as I can tell; I have thought that it probably was a little over the line at the western corner.

### ON CROSS-EXAMINATION.

"Question by plaintiff's counsel—At the time spoken of, when you attempted to indicate street lines and fix the grade of pavement, did you have the lines of the lot on the north side of Main street run by a surveyor?

" Answer—No sir: It was generally understood that those buildings on the street from Despard's corner up to frame buildings east of Dolan's were on the true line,

1879
June Term.

Boughner
v.
The Town of
Clarksburg *et al.*

and we took it from that. I was here at the time these frame buildings were put up, now occupied by Mr. Jas. P. Davis: I knew that the man who put up that frame building put it as near on the true line as he could get it, for I was interested in it. It was put up, I think in about 1832.

"Question by same—In indicating the street line west of Fourth street, did you do it by merely looking at a building or buildings between Third and Fourth?

"Answer—So far as I did it, I endeavored to get the line by sighting along the buildings from the Third street up to this frame building occupied by Jas. P. Davis; there was no other means taken at that time to fix the line.

"Question by same—Was any change made at that time or since, to your knowledge, in the lines of lots west of the property then owned by Thorn? If so, what were they?

"Answer—None that I know of.

"Question by same—How long has the fence immediately west of the Thorn lot been on Main street where it is now located?

"Answer—I do not know.

"Question by same—Was it not built there during the lifetime of John L. Sehon?

"Answer—I do not know; a part of the fence was a rail fence when we were at work there; the men who worked the street along there dug under the corners of the fence about half way; the corners of the fence hung over the bank of the street several feet.

"Question by same—Do you know who owned, at the time you did that work along there, the lot No. 2 west of Fourth street, now owned by plaintiff?

"Answer—I do not know"

### RE-EXAMINED.

"Question by defendants' counsel—As there is some misunderstanding among counsel as to a part of your examination in chief, please state again what you did to-

wards fixing or indicating the line on the north side of Main street from Fourth street, west and south of plaintiff's lot; state all or anything plaintiff said or did about said line as fixed by you.

"Answer—I have already stated what occured between Thorn and myself. I do not recollect now of any conversation that I had with Mr. Goff about the fence; I think he was on his lot, probably in company with Mr. Thorn, and understood from some source what we had concluded to do; he moved his fence back a distance, on a line with Mr. Thorn's; at least, the fence was moved—they acquiescing in what we had determined to do. Mr. Boughner was there several times looking on, and probably giving some instructions about hauling the dirt along the grade for the sidewalk. He knew the distance we went back, the six feet—the line we fixed, because I told him myself, and it was. He approved of it, and during the progress of the work, he manifested a good deal of anxiety about having the lines fixed, and acquiesced in it, and until recently, I never heard of his making any objections; he certainly never did to me as I now recollect. I have already stated that building upon said lot was built in conformity to such lines. I have thought the western corner of said building might be a little over the line."

William R. Alexander, the street commissioner, witness introduced by defendants, stated that he was ordered by the "board" to give the grade asked for in said application, and did give it. His deposition proceeds:

"Question by same—Please state in what manner you gave the grade of said streets, and whether you indicated the lines thereof at the time of so grading the same?

"Answer—I gave the grade by the eye; had no engineer, or surveyor; when I went to give the grade, I was shown a stake or post indicating the line of where the house was to be built by Mr. Boughner; he showed me where the line was, and I marked out the sidewalk and pavement for him, and he showed me where the house was

to be built, and I gave him the grade of the street and pavements; 'Squire Werninger was there when I got there.

"Question by same—Have you any recollection at this time of the line on the north side of Main street, and south of the lot owned by the plaintiff, being fixed or indicated at that time?

"Answer—I do not.

"Question by same—Please state wh ether the building erected on said lot conforms to the line of sidewalks and pavements graded and marked by you?

"Answer—It does.

"Question by same—Please state whether as street commissioner you filled any part of said lot or pavements with earth or dirt.

"Answer—I did fill where the pavement was to be made; I do not recollect whether I put any on the lot or not.

"Question by same—State if you know whether the plaintiff ever made an application to the council of said town for liberty to lay a brick pavement on the north side of Main street; and state whether any such pavement was laid, and whether he was allowed for laying the same, or any part thereof.

"Answer—There was an application made and permission granted him to lay said pavement. Mr. Boughner was allowed a credit on his taxes for laying four feet in width of it.

"Question by same—Who superintended the construction and laying of said pavement?

"Answer—I did; I think it was laid in 1873, and I reported the amount Mr. Boughner was entitled to credit for on his taxes for laying the same."

CROSS-EXAMINED.

"Question by plaintiff's counsel—State if you recollect how you designated the grade of said pavements.

"Answer—My object was, when I graded it, to get the

pavement a little higher than the street—is all I recollect about it.

1879
June Term.

Boughner
v.
The Town of
Clarksburg et al.

"Question by same—Did you not mark the grade on a locust post that stood about the outer edge of the present curb-stone, which said post was formerly used as a post of the fence that enclosed said land?

"Answer—I think I marked it on a post or stake; I do not recollect whether it was a post of the fence that enclosed the land, but think it was near about where the fence did stand; it may have been a post. I do not recollect whether it was near the curb-stone or not.

"Question by same—Was not that post several feet south of the point where the plaintiff indicated to you, that he proposed to erect his building?

"Answer—I do not recollect. It was a short distance from the corner of the house, but do not recollect whether it was south or east of the corner.

"Question by same—Did not the plaintiff claim at that time that the said post or stake marked the line of his lot?

"Answer—I do not recollect whether he did or not.

"Question by same—Do I understand you correctly in saying in answer to question propounded to you by defendants' counsel, that you did not fix the line of the lot of the plaintiff at that time, but fixed the grade of the pavement from where the plaintiff indicated he intended to erect his building?

"Answer—You do."

### RE-EXAMINED.

"Question by defendants' counsel—Who put in the curbing for the pavements on Main street south of plaintiff's building, and curbing on Fourth street east of said building?

"Answer—I think Mr. Stuck did; I think Mr. Boughner paid him and was allowed credit on his taxes.".

O. P. Boughner, deposed, that to the best of his knowledge the authorities of the corporation never responded to the latter part of said application, as to an

1879
June Term.

Boughner
v.
The Town of
Clarksburg *et al.*

indication of street lines ; but corroborates Alexander's statement as to his indication of the grade of the sidewalk, by a notch in the post, alluded to. The plaintiff also corroborates Alexander's statement as to his having indicated the said sidewalk grade by a mark on the said corner post, but has no recollection of anything being done towards fixing the line between Main street and their lots; but, he says, "the post indicated the line." He further states that he never heard of the lines being drawn into question until since this difficulty occurred.

It is quite apparent that the town authorities did not establish or fix the line between plaintiff's lots and Main street as applied for; and the minutes of the board, of April 12, 1872, show that they only authorized the establishment "of the grade of the street;" and it is shown by the foregoing depositions, that all the street commissioner did, under the order of the board, was to fix for Boughner the grade of the street and pavement ; that he did so by marking the grade on a stake or post shown him as "indicating the line of where the house was to be built by Mr. Boughner." The street commissioner says that Boughner "showed me where the line was, and I marked out the sidewalk and pavement for him, and he showed me where the house was to be built, and I gave him the grade of the street and pavements;" and he positively states that he did not fix the line between the street and plaintiff's lots. Hence the inference is, that as to the line between the street and the lots, the commissioner only took it to be as indicated by plaintiff, and simply fixed the grade of the street and pavements that the plaintiff might govern himself accordingly in the building of his house. What did the plaintiff consider the line between his lots and the street? He says in his deposition, that he fixed and determined the line, "by the line of the fence, a part of which was standing at the time of the joint purchase of the Sehon square, and by the survey that was made when said square was divided into lots, I refer to the survey made by Col.

Haymond." He further states his recollection, "that the fence stood about on a line with the curb-stone as it now stands, south of the building, and that there were some scattering planks still adhering to the posts, and that most if not all the posts were still standing;" and that certain of the posts were removed at the time plaintiff had dirt hauled on the lots during the summer of 1869, all the others were removed by Wm. L. Freeman, except the corner post which marked the grade of the pavement, and stood near the outer edge of the curb-stone running up and down Main street outside of lot number one. It (the marked post) stood there until some time after the curbing was put in. Luther Haymond states, that he had known the " *Sehon square*" for thirty or forty years; that he assisted in laying off that property into town lots in 1869, as surveyor, "and "he says "the lines of the Boughner lots in front correspond with the old posts of the Sehon property, along the north side of Main street, and that line is some four or five feet by my estimation from Boughner's brick house, and the greater part of the pavement is on what I consider his private property." He thinks the old posts stood near the curb-stone south of the south-east corner of Boughner's brick house ; that he thought the fence remained on that line from his earliest recollection of it up to within some ten or fifteen years, when the fence was set in by T. S. Spates some three or four feet from nearly opposite the old Sehon house down to the alley (Fourth street.) His impression was, that it was set in to give a walk, but he did not know what it was done for. He says on cross-examination : " I mean to say, that the old posts, by which we were governed in laying off the lots, were found some three or four feet south of the fence as it then stood ; that the old posts were near the curb as it now stands, but I think a little north of it." He made the degree, or bearing on the line running up Main street, north seventy-one and one-eighth degrees west by the magnetic meridian.

1879
June Term.

Boughner
v
The Town of
Clarksburg *et al.*

1879
June Term.

Boughner
v.
The Town of
Clarksburg *et al.*

Jasper Y. Moore, testifies: that the pavement proposed to be laid by the town on or near lot number two, is inside of the line he and Col. Haymond ran as the dividing line between Main street and Sehon square, or upon what they then regarded as the Sehon property; but he states that a survey was not made at that time of the line of Main street with a view to ascertain where said street line was; and the only knowledge he has of the boundaries, is derived from the survey he and Haymond made, together with the old fence posts they found in running the line between Main street and said property, one of which stood very near the curb-stone in front of the residence of Mr. A. G. Smith, and others in front of the lots west of the house now occupied by Mr. John Brown, and others on the line between Turnpike street and said property. He did not know precisely where the fence stood between Main street and what are now the Boughner lots numbers one and two, at the time of the purchase and partition of "Sehon square," but his recollection is, as to lot number one that the fence stood from two to four feet on the inside of the line run by Col. Haymond, which line was about where the present curbstone now stands.

W. L. Freeman who purchased and removed the posts except the corner one, as stated in plaintiff's deposition, testified as to the location of the fence and fixed the location of the said corner post, which bore the commissioner's mark for the pavement grade, as follows: "My recollection is, that it stood a little outside of the curb-stone at the corner of Fourth and Main streets; I mean outside of the curve of the present curb, more on Main street." He further states: "There is nothing to show where the post stood; I speak it from recollection, mostly, and from where the line of the old fence stood; my attention was not called to it more than five minutes till I went right to it; it has been two or three days ago since I was there."

Nathan Goff, Sr., deposed he had known the "Sehon square" ever since 1815, and is acquainted with that

part set off to plaintiff and upon which he erected a brick storehouse, on or near the corner of Fourth and Main streets. He had the old original fence, which had been standing there for years, taken away, and had the new fence made and set in five feet, or more, probably six feet, north from the street, on the lot. When Mr. Boughner was about building that brick house, he, the witness, informed him where the the true line was. When he was about setting his curb-stone, witness again showed him where the true line was, and having since examined the curb-stone, thinks they are on the line, may be an inch or two one way or the other from it; and as near as he can judge, he says, the curb-stone is right on the line where the old fence, which he had set in, used to stand on Main street; and that when the company divided that lot off to Boughner, the fence, or part of it, that witness had put up, remained; and on that side of the lot next to Main street the most of the posts still stood, and some of the planks were there. He says that his knowledge of where the true line is " was based upon the knowing where the old fence stood." From the foregoing brief statement of the evidence, which I deem correct, it is clear that at the time Boughner sought the authorities of Clarksburg for an indication of street lines, neither he, nor the town, had any other pointers of the line between Main street and his two lots than the posts of the old fence. The fair inference from the testimony is that the line of the old fence, as indicated by those monuments of its former, and aged existence, was the publicly conceded line of Main street; and that the street commissioner so considered it at the time he graded the pavement, is probable from the fact that he did not then fix the line between the street and the plaintiff's lot, as he admits he did not in his deposition.

If that be so, then Boughner knew the street line, which was also the line of his own property, and so far as lot *number* one is concerned, he built the pavement (except the curbing) there between his brick storehouse

52

1879
June Term.

Boughner
v.
The Town of
Clarksburg *et al.*

and Main street upon his own land, according to the grade indicated by the street commissioner. Boughner so claims, because he testifies: "I have always considered that the full width of the pavement, south of the house on Main street, belongs to the lot number one on which the house and pavement is built. I am not certain about the distance; think it is seven or eight feet—the full width of the pavement." If therefore it be true that the whole of the pavement, as built by plaintiff, is on his lot number one, can it be considered as dedicated by him to the public use? It is claimed by the defendants that the town of Clarksburg not only laid the curb-stone for such pavement on Fourth and Main streets, but that he was also allowed for building said pavement from the southeast corner of his said storehouse to the north-west corner of the same on the north side of Main street, a credit on his taxes levied and collected by said town. Plaintiff admits the laying of the curb-stone by the town, and that he, or D. Boughner & Son, had received a credit from the town on their taxes for part of the cost of laying that part of the pavement, and it was proven that plaintiff was credited by the town on his taxes, for the year 1874, $37.00, for fifty-three yards of said pavement adjoining said storehouse on Main and Fourth streets, and that in the same year the town paid for putting in the curbing around said storehouse on Main and Fourth streets. Mr: Oliver P. Boughner, the son and partner of the plaintiff, and joint owner of lots numbers one and two, as they both testify, on cross examination by defendants' counsel, deposed as follows:

". Who caused the said curbing to be put in, and who paid for putting in of the same.

." Answer—I don't remember, but believe it was the universal custom of the corporation to set curbing, and suppose this was no exception.

" Question by same—Is it the universal custom of the corporation to cause curb-stones to be put down for the

1879
June Term.

Boughner
v.
The Town of
Clarksburg et al.

construction of pavements for the private use of individuals over their private grounds?

" Answer—I was a member of the town council for twelve months, and to the best of my knowledge a curbstone was always set whenever any property holder indicated a desire to lay a pavement in front of his property. In some instances in positions where it would not be joined by any other pavement at either end, and without reference as to who might get the benefit of it at the time.

" Question by same—Were such requests ever granted on curbing put in by the corporation, except where the public were to use said pavement and to encourage the building of pavements for public convenience, or do you mean to say that the corporation is in the habit of, or has in any instance appropriated corporate funds in laying curbs to enable private individuals to build sidewalks and pavements ?

" Answer—I think the understanding was always implied that they were to be open to the use of the public.

" Question—Were not all such pavements when constructed regarded and treated by the corporate authorities as a part and parcel of the public streets, as much subject to their control and to the use of the public as any other part of the street ?

" Answer—I never knew of any question of dispute arising as to the matter of ownership. Some of them were used almost exclusively by the adjoining property owners.

" Question—How did you regard such pavements so constructed when you were a member of the town council ?

" Answer—I regard the citizen as having indicated his disposition to allow the public to use the pavement.

" Question by same—Did not D. Boughner and D. Boughner & Sons apply to the council of the town of Clarksburg to set the curbing around their lot on Main and Fourth streets, and for leave to construct pavement on said streets ?

" Answer—I don't remember, but have an impression they did, so far as relates to the frontage of their buildings on said streets.

" Question by same—Did you regard them by this act as indicating their intention to permit the public to use said pavement when constructed ?

" Answer—We always intended and never refused to allow anybody to use it."

Having thus examined the testimony, I deem it unnecessary to make farther citation of defendants' proof at this point as I am plainly led to the conviction that, whilst the mere application set out by said exhibit A. was not an act of dedication, nevertheless, that D. Boughner & Son, in permitting the town to set the curbing on lot number one at its own expense, and in accepting from the town a credit on their taxes, for part of the cost for the pavement laid by them in front of their storehouse, as before stated, plainly indicate their intention to allow the public to use the pavement, and that such conduct amounts to acts of dedication to public use to the extent of the four feet in width for which he received pay. Therefore I am of opinion that D. Boughner & Son, have by said acts dedicated the said four feet of pavement in front of lot number one, to the public use. Taking this view of the case so far as lot number one is concerned, it is not necessary to consider the claim made by the town as to the line of Main street in front of lot number one.

The real ground for the plaintiff's prayer for injunction, is the proceeding on the part of the town to construct the pavement along lot number two, or in other words, to make a continuation or extension of the pavement from lot number one along Main street and said lot number two.   It will be seen from the answer, that the defendants admit they did, without plaintiff's consent, attempt to construct such pavement on the north side of Main street and on the south side of plaintiffs lot from the southwest corner of said lot to the southeast

corner of the lot owned by Holmes, a distance of forty-one feet, and were forbidden and prevented by plaintiff from completing it. [The pleadings do not designate the lots as numbers one and two, but they are thus distinguished by the proofs in the cause, which distinction I adopt for its convenience.]

The plaintiff claims that the pavement was attempted to be made entirely on his said lot, without his consent, and without having first condemned the ground in the manner provided by law; and that defendants' refuse to make a crossing for horses and wagons across the pavement. The defendants claim, that the pavement if laid as they proposed, will not interfere with any right of the plaintiff, or take any ground, or any part of said lot, to the use of which the public are not entitled; they deny that the plaintiff has any right under any pretense of title to the same, to prevent the building of the pavement, or to deny to the public the use of the ground proposed to be taken for the same; also if plaintiff's pretentions were true, and his denial of the town's right to the use of the said ground were well founded in fact, yet, the right to withhold such use "could extend only' to the ground embraced in the boundaries of his alleged title, and that outside of his pretended claim of title there is a strip of ground over which it was proposed to lay and build said pavement," that does not belong to him, but to the public, and the right to control which belongs exclusively to defendants; but the defendants also claim, that whatever exclusive rights plaintiff may have had in said premises, have been surrended by him by dedication to the public, and to sustain themselves in their claim to dedication, they refer to plaintiff's application to the council as shown by exhibit A, filed with their answer, and which I have already considered in reference to lot number one; and they also rely on his acceptance of the credit given him on his taxes as part pay of the costs for building the pavement in front of his brick storehouse, which I have also considered with reference to lot num-

1879
June Term.

Boughner
v.
The Town of
Clarksburg et al.

ber one. As to the question of dedication, the proofs are the same as stated in the consideration of that question in reference to lot number one, and which appertained exclusively to that lot except the following additional testimony by O. P. Boughner, a witness for plaintiff, and part owner of lot number two:

" Question by plaintiff—State if any pavement has been constructed or attempted to be constructed, on the south side of plaintiff's lot number two, since the former pavement was laid; if so, state when and by whom, and to what extent the same has been completed.

" Answer—A month or two ago, some laborers commenced to lay a pavement under the direction of M. W. Ball, street commissioner, on the south end of lot number two. We had proposed that if the corporation would lay the pavement and put in a crossing without subjecting us to inconvenience or costs, that we would give them the ground upon which the pavement was to be laid. After it had been commenced, and laid perhaps half way from the west end, we ascertained that they were not going to put down a crossing. We then interrupted the work; told the street superintendent that we should not permit it to be so put down without a crossing. It was abandoned by him and so remains.

" Question by defendants—You say in your examination in chief, that ' we had proposed that if the corporation would lay the pavement (referring to pavement, the building of which was interrupted), and put in a crossing without subjecting us to inconvenience and costs, that we would give them the ground upon which the pavement was to be laid.' Was such a proposition ever submitted by D. Boughner, the plaintiff, or by D. Boughner & Son to the council of the town of Clarksburg before commencing to lay the pavement west of said brick pavement? If such proposition was submitted, by whom and when?

" Answer—It was submitted to the town council through the street commissioner, Mr. Ball, who asked

me whether we would lay the pavements and take it out of the next year's taxes, or whether Mr. Holmes should do it as he proposed. I told Mr. Ball that it wasn't material who did it, but that we must have crossing.

" Question by same—When was this, and did you submit through Mr. Ball the proposition stated by you in your examination in chief to the town council?

" Answer—I made this response to Mr. Ball, as the agent of the corporation, and have no personal knowledge of any other communication. I should say that this conversation occurred with Mr. Ball ten days or two weeks before the pavement was commenced to be laid. I do not know whether he communicated such a proposition to the town council or not.

" Question by same—Have you any knowledge of such a proposition, coming from the plaintiff or D. Boughner & Son, being communicated by them, or any one for them, to the council of the town of Clarksburg prior to to work being commenced on said pavement?

" Answer—As stated in my last answer, I have not any knowledge of it.

" Question by same—What sort of crossing was it you wished to be laid on said pavement?

" Answer—Such a crossing as would allow the passage of horses and wagons."

The plaintiff also testified as follows:

"Question by plaintiff's counsel—State what agreement, if any, you had with the town authorities with respect to the laying of the pavement on lot number two.

"Answer—I had no agreement that I know of. I never asked for the pavement to be laid there, and was not aware that anybody else had, until I saw them coming on to lot number two with the extension of the pavement.

" Question by same—Have lots numbers one and two ever been enclosed since they were allotted to you?

"Answer—No, sir; they have not.

" Question by same—When you discovered that the

1879
June Term.

Boughner
v.
The Town of
Clarksburg *et al.*

pavement was being laid, did you have any conversation in respect to the same, and with respect to your right to cross the pavement when laid, with M. W. Ball, the street commissioner, while he was superintending the laying of the pavement under the authority of the town of Clarksburg? if so, state what such conversation was.

"Answer—The first that I discovered that they were laying the pavement on lot number two coming from the Holmes corner, was the evening of the day before the injunction was got out. Mayor Tinsman's two boys were the men at work at the time, and I had not been aware or informed that there was an order before that for anybody to lay it; neither was I aware of the fact that an application had been made to the town authorities for permission or authority to lay a pavement on said ground. When I saw that Tinsman's boys had commenced laying the pavement on the south end of lot number two, I went out to where they were at work, and told them that said pavement must not be laid, except there would be put in a good stone crossing ; James, I believe it was, replied that he didn't know anything about it; early next morning, perhaps before seven o'clock, in going to the rear part of the dry goods room, I discovered that James Tinsman and M. G. Holmes were very actively at work at said pavement ; I went immediately out to where they were at work, and told them that said pavement should not be laid except a crossing as above referred to was put in ; Holmes replied that they did not want a crossing ; they kept on actively at work ; I became excited and used some threatening language ; I told them that they were trespassing on our property, and warned them to desist.    Several persons came up, and among them M. W. Ball.    I asked Mr. Ball if they continued on or made the pavement, if we would be permitted to drive across with wagons or take horses across; he replied that we would not.    The excitement becoming greater, Oliver having come out, the work temporarily ceased.    Holmes as I understood it, appealed to Ball for protection that

they might go on and lay the pavement. Mayor Tins- <span>1879<br>June Term.</span>
man, seeing or understanding about the difficulty, said <span>Boughner<br>v.<br>The Town of<br>Clarksburg et al.</span>
that he was not aware that the ground on which said
pavement was being laid was private property, or claimed
as private property, (I don't remember which), and or-
dered the work stopped. I then notified Tinsman, in
presence of M. W. Ball—they were both standing close
together—that I would get out an injunction. Mr. Ball
said I had better serve it on them that evening that
they might move the material to another place.

"Question by defendants—Did you make any objec-
tion to the construction or laying of said pavement, ex-
cept that it was being laid without a stone crossing?

"Answer—We did not, and never have made any ob-
jection to the laying of the pavement; perfectly willing
to give them the ground, if they will put a stone crossing
there, and always have been ever since a pavement was
spoken of there. I demanded a stone crossing, because
I did not know that anything else was ever used for
making crossings."

Taking the view I have, that the mere application
made by D. Boughner & Son, to the mayor and town
council of Clarksburg for an official establishment
of the grades for sidewalks on Main and Fourth streets,
and for on indication of street lines, was not of
itself an act indicating a purpose to dedicate ground
to public use for pavements; and that the application
itself was intended only to apply to lot number one, be-
cause the written application of April 12, 1872, I think,
indicates that lot alone, by the phrase, viz: " With the
intention of building on our lot on the northwest corner
of Main and Fourth streets, we hereby apply" &c.; and
also, because, the evidence shows that the curbing put
in at the expense of the town was only along said
lot number one on Main and Fourth streets, as also
the pavement built by the plaintiff, for part of the costs
of which he accepted credit from the town on his taxes
due it, I am of opinion that those acts do not indicate an

53

intention on the part of D. Boughner & Son to dedicate any of their ground on lot number two to public use for a pavement, or sidewalk; and therefore, we are left for evidence of the intention of dedication, alone to the testimony of O. P. and D. Boughner, just stated. From that testimony, which is not contradicted, and must be taken as true, I am led to the opinion, that so far as the pavement was to be laid on the ground of lot number two, they did intend to dedicate the ground to the public use for a pavement, but only upon the condition and for the consideration that the corporation would put in a proper crossing for wagons and horses and not otherwise. I think, as said in argument, that where the dedication is on condition, the terms of the dedication must be strictly complied with. See also 2 Dillon on Corp. p. 480, ch. 17, §495. It appears from the evidence, that the corporation was proceeding to construct the pavement without making the crossing as proposed and intended by D. Boughner & Son, and as it has braved this injunction suit, still refusing to construct the crossing, it is plain they have not, and did not intend to accept the proposition of D. Boughner & Son to dedicate the ground for a pavement upon the condition that the town made, at its own expense, the crossing.

The right, theretofore, to lay the pavement depends wholly upon the town's right to the ground over which the pavement was being laid. If the street line is really where the old fence stood as indicated by the old posts, then Boughner's claim, that the whole of the ground proposed to be taken for pavement purposes by the town, belongs to him, is well founded, and injunction should be afforded him to restrain and inhibit the town authorities from laying the pavement without constructing the crossing as proposed by Boughner, or without having condemned the ground, as provided by law. But it is claimed by the town, that they own, if not the whole of the ground, at least a part of it; and not content with the line as indicated by the old fence posts,

they made an order on the same day that this injunction was granted, November 13, 1875, directing John R. Boggess, *surveyor,* to make a survey of Main street from Fourth to Chestnut, which he did, and made the following report thereof:

" *To the Hon. E. Tinsman, Mayor, and the Council of the City of Clarksburg, W. Va.:*

" Pursuant to the order made on the 13th November, 1875, directing a survey of Main street from Fourth to Chestnut, I have examined carefully the conveyances of the land embracing that part of the city from the original owner of the land down to the present time, and find it as represented on the map herewith filed marked "X." Daniel Davisson, in his conveyance to Hez. Davisson in 1790, calls for running from the northwest corner of Main street at D, south ten west fifteen links; and thence along the road north seventy-two and one-half west twenty-nine poles and twenty links to a corner at E; and thence with his line north one degree west seventy-one poles twelve links to a maple on the bank of the creek at F., &c. The greater portion of this same lot of land was sold by Ithamer P. Davisson to H. M. Tate and Josiah Adams, the 20th April, 1812. This conveyance begins on the west side of Third street opposite the corner of the brick house in which Lloyd Lowndes now resides. The last line of this conveyance runs with the north side of the road on Main street to the beginning, calling for south seventy and one-half east twenty-eight, poles. Shortly after the conveyance to Tate and Adams, B. Williams, Jr. obtained an interest in the said tract, and in connection with the said Tate and Adams, laid off into lots the third addition to the town of Clarksburg, and now known as the portion lying between Third and Fourth streets and Main and Turnpike streets. In this addition, it appears that the east side of Third street, between Main and Pike, is three hundred and ninety-six feet in length, while on the west side it is only three hundred and eighty-six feet. Assuming that Mr.

Lowndes's brick dwelling house is on the southwest corner of Main and Third streets, the southeast corner of the said Tate, Adams and Wilson's addition ought to be five feet north of the said original corner opposite the said brick house, which seems to have been observed in building the house on the north side of Main street. The property west of Third street, known as the Sehon lot, was conveyed by Daniel Davisson to Nathaniel Davisson, 9th October, 1797, and by William Martin, sheriff, to John L. Sehon, 1st September, 1813. These conveyances both begin on the north side of the road on Main street, and at the southwest corner of the property conveyed by I. P. Davisson to Tate and Adams, which according to the most liberal construction, would be at a point on the east side of Fourth street, and running south of D. Boughner's brick storehouse four feet. I am of the opinion that the north side of Main street, from Third to Chestnut was and is a straight line—bearing, now, north seventy west. On this line, I have driven stakes from Third to Chestnut streets. The line passes south of Boughner's storehouse four feet, and north of the pavement curbing, south of said house, three feet. The northwest corner of Third, on the south side of Main street, is — feet south of the northeast corner of the brick tavern-house, known as the " National Hotel," or " Bartlett House," and — feet west of the corner of said house. The east end of said " National Hotel" is — feet on Third and the front or north side is four feet on Main street, I have staked the line of Main street, on the south side, from Third street to the Weston turnpike road.

　　"Respectfully submitted,
　　　　　　　　" John R. Boggess, *Surveyor.*"

　　The defendants also took the deposition of said Boggess, on the 14th day of January, 1876, who deposed as follows :

　　" Question by defendants—Where do you live and what is your occupation ?

　　" Answer—I have been residing in Clarksburg for the

last two or three years; I have been acting as commissioner in chancery and surveyor for the United States Court in this district; I have been deputy surveyor for the county of Harrison the greater part of the time for the last twenty years.

" Question by same—Are you acquainted with a lot of ground situate in Clarksburg, on Main street, owned by the plaintiff, and with the ground on Main street on the south side of said lot over which the defendants proposed to lay a pavement? If so, please state whether or not you have recently been upon the said ground as surveyor, at whose instance, and what did you do?

" Answer—I have been upon the ground and surveyed it recently for the corporate authorities of the town of Clarksburg. In order to ascertain the true boundary line of the north side of Main street, I examined the records of the clerk's office of the county court of Harrison county, showing the conveyances of the patentees of said land down to the plaintiff; and after examining the said records, surveyed and staked the said lands from the corner of Fourth street to Chestnut street, which line is correctly represented along the property of the plaintiff as exhibited on the plat herewith filed marked " A." As shown by the said map, the pavement is seven feet wide from the corner of Fourth street to the corner of Holmes's lot, and appears to be upon the lot of the plaintiff three feet and ten inches at the corner of Fourth street, and two and a half feet at the corner of Holmes's lot. The pavement as laid south of the plaintiff's building, appears to be three feet and two inches outside of the line of his lot, and three feet and ten inches inside the line of his lot at the southeast corner of his building. At the southwest corner of the said building, the said pavement appears to be three feet and two inches on the plaintiff's lot, and three feet ten inches south of it. At the west end of the plaintiff's lot, two and one-half feet of the said pavement appears to be upon the said lot, and four and one-half feet upon the street. The distance between

Holmes's corner and the southwest corner of plaintiff's building is forty-one and one-third feet. Papers marked B, C and D, together with the paper filed marked A, are the reports and plats of the survey I made, designating the street lines, and the lines of the lot conveyed to the plaintiff, according to the several deeds of conveyances.

" Question by same—What part if any of the proposed pavement between the Holmes corner and the southwest corner of the plaintiff's building has been laid ?

". Answer—I think about one-half of it."

CROSS-EXAMINATION OF JOHN R. BOGGESS.

" Question by plaintiff's counsel—Please state at what point on the plat marked B is the beginning corner in the conveyance from Daniel Davisson to Hezekiah Davisson in 1790 ?

" Answer—Beginning at a point marked A on the plat, on the bank of Elk creek.

" Question by same—At what date was the first survey of said land made, as shown by the records you investigated ?

" Answer—It appears to me that the first survey of the lands of Daniel Davisson was made prior to 1784.·

" Question by same—In Davisson's said deed in 1790, what is the bearing of the call from Main street along the line of the plaintiff's property ? .

" Answer—North seventy-two and one-half west.

" Question by same—On the plat marked " A," what is the bearing of Main street from the corner of Fourth street to the letter " B " on said plat or to Holmes's corner?

" Answer—North about seventy degrees west.

" Question by same—Why do you allow the two and one-half degrees variation ?

" Answer—That is about the difference in bearing of lines run in 1784 and now.

" Question by same—Is not the usual allowance for variation one degree for every twenty-five years?

" Answer—Yes, sir ; that is the variation ; my experience shows that to be about the variation.

Question by same—Then if said line along Main street north seventy-two and one-half west was run prior to 1784 at the rate of one degree for twenty-five years, is the present call, as you have located it, north seventy west, an observance of the usual rule for variation ?

" Answer—It is ; for a number of years after 1784 the variation was eastward, and for the last sixty or seventy years it has been westward. The greatest variation in lines that I have found was in those run between 1800 and 1810.

"Question by same—From what do you establish the width of Main street ?

"Answer—From the conveyances of the Davisson lands on each side of the street, west of the west end of the original town of Clarksburg ; and the street west of that seems to have been sixty feet wide."

Thus it will be seen from Boggess's testimony, that allowing two and one-half degrees variation from the bearings, and calls in Davisson's deed of 1790, from Main street along the line of plaintiff's property, thus changing the bearing of the call in said deed from north seventy-two and one-half degrees west to north seventy degrees west, the proposed pavement is still about one-half on plaintiff's ground.

Therefore as it appears from said survey, that the town was proceeding to lay a part of said pavement on the ground of said plaintiff, without having obtained his consent, as admitted in their answer, and without having first had the ground condemned as required by law, I am of opinion that the judge of the circuit court erred in dissolving the injunction entirely ; and as some of the evidence of the plaintiff tends to show that the whole of the said pavement proposed to be laid by the said town may be on his land, the judge of the circuit court ought not, on the motion to dissolve, to have dissolved any part of the said injunction, but should have continued it in force

until the final hearing of the cause, and then perpetuated or dissolved the said injunction in whole or in part according to the evidence that might then have been in the cause, and the principles governing courts of equity in such cases.

Therefore it is considered that the order of the said Judge of the circuit court, made in vacation on the 22d day of January, 1876, dissolving said injunction, be reversed, and that the appellees do pay the appellant his costs in this court expended in the prosecution of this appeal and *supersedeas*, and this Court proceeding to render such decree in the cause as the Judge of the circuit court should have rendered on the said 22d day of January, 1876, upon the motion of defendants to dissolve the injunction theretofore allowed in the cause, it is adjudged, ordered and decreed, that the said motion to dissolve the said injunction be and the same is hereby overruled, and the said injunction is continued in force until the final hearing of the cause; and this cause is remanded to the said circuit court of Harrison county with instructions to the said circuit court to further proceed therein according to the principles settled by this opinion and according to the principles and rules governing courts of equity in such cases.

JUDGES GREEN AND HAYMOND CONCURRED.

DECREE REVERSED.   CAUSE REMANDED.