# CHARLESTON.

SPENCER *v.* POINT PLEASANT & OHIO R. R. Co. *et als.*

Submitted January 18, 1884—Decided February 4, 1884.

1. If a railroad company take the land of any person without having first paid a just compensation to the owner or having secured

it to be paid in the manner prescribed by law, the owner as a matter of right in any such case may enjoin said company from using said land for its purposes till the company have so paid or secured to be paid such just compensation, as by section 9 article III. of our Constitution companies are required to pay or secure to be paid before taking such land ; and the observance of this provision of our Constitution can be enforced in no other manner than by the granting of such injunction by a court of chancery.

2. If a railroad company without taking the land damages it by the construction of its road the owner of such land cannot as a matter of right enjoin said company so proceeding with the construction of its road till such damages are ascertained and paid; for section 9 of article III. of our Constitution, while it gives a right in such case to recover of a railroad company such damages in an action at law, does not give a right to such injunction ; as it does not require such damages to be paid or secured to be paid before such damages actually arise by the construction of the road.

3. But under peculiar circumstances, as for instance where the property is entirely destroyed in value as effectually as if it had actually been taken by the railroad company in constructing its road, such person may obtain an injunction ; and upon this principle such an injunction was awarded in *Mason* v. *Harper's Ferry Bridge Company*, 17 W. Va. p. 396.

4. If a railroad company with the consent of a town-council builds its road through a street of a town, the fee of the ground, on which the street is located being in the adjoining owners of lots, the railroad company does not take the property of such lot-owners, but only an easement from such town-council, a simple right of way so long as the council has an easement in such ground to use it as a street.

5. Such adjoining lot-owners have therefore no right as of course, whether they own the fee in the ground covered by such street or not, to obtain an injunction enjoining such railroad from occupying and using such road, till the damages done to such lot-owners is ascertained and paid or secured to be paid. Such injunction can be obtained only under peculiar circumstances.

6. But such lot-owners, whether they own such fee in the street or not, may by an action at law recover of such railroad company such damages as they might have recovered in a common-law suit, had the railroad company built its road in said street without proper authority ; for while such railroad company has built its road by proper authority conferred directly by the Legislature or by a town-council authorized so to do by the Legislature, it cannot be regarded as committing a nuisance in so build-

| | |
|---|---|
| 23 | 406 |
| 58 | 262 |
| 58 | 502 |
| 23 | 406 |
| 60 | 667 |
| 60 | 671 |
| 23. | 406 |
| 61 | 360 |
| 23 | 403 |
| 63 | 22 |
| 23 | 406 |
| 65 | 744 |
| 23 | 406 |
| 66 | 15 |

ing its road and using it in a careful and proper manner. Yet under section 9 of article III. of our Constitution said railroad company is liable for the permanent damages it inflicts on such adjoining lots in the same manner as if it had built its road without such proper authority; but after it has been once sued for such damages it is not liable to be sued for the nuisances, which necessarily result from the running of its cars through such street, for in so doing it is only exercising its rights and is not committing a nuisance.

The opinion of the Court contains a sufficient statement of the facts of the case.

*George F. Couch* and *C. H. Lamison* for, appellants.

*Simpson & Hubbard, C. E. Hogg* and *Tomlinson & Polsley* for appellee.

GREEN, JUDGE:

The proper determination of the questions involved in this cause will depend largely upon the true construction of section 9 of article 3 of our Constitution. See Acts of 1872–73, p. 6. It is as follows: "Private property shall not be taken or damaged for public use, without just compensation; nor shall the same be taken by any company, incorporated for the purpose of internal improvement, until just compensation shall have been paid or secured to be paid to the owner; and when private property shall be taken or damaged, for public use for the use of such corporations the compensation to the owner shall be ascertained in such manner as may be prescribed by general law : Provided that when required by either of the parties, such compensation shall be ascertained by an impartial jury of twelve freeholders." This was a substitute for the provision in our previous Constitution of 1861, which was: "Private property shall not be taken for public uses without just compensation." See Constitution of 1863, article 2 section 6; Code of West Virginia p. 21.

There had been some diversity of opinion as to the construction of this provision in our old Constitution. A provision similar to it and expressed in very similar language had been incorporated in nearly all the Constitutions of the

different States. They were generally taken from a provision in the Constitution of the United States, which was in the same language as this provision in our Constitution of 1863. See concluding clause of article 5 of the amendments to the Constitution of the United States; Code of West Virginia p. 15. This provision contained in our Constitution of 1863, in the Constitution of the United States, and in the Constitutions of nearly all the States has been frequently construed by the courts, but the construction of it has not been entirely uniform.

Kent in his Commentaries, volume 2 p. 399, says: "The Constitution of the United States, and of most of the States of the Union, have imposed a great and valuable check upon the exercise of legislative power by declaring, that private property should not be taken for public use without just compensation. A provision for compensation is a necessary attendant on the due and constitutional exercise of the power of the Legislature to deprive an individual of his property without his consent; and this principle in American constitutional jurisprudence is founded on natural equity, and is laid down by jurists as an acknowledged principle of universal law." In a note to this passage he says: "The better opinion is, that the compensation or offer of it, must precede or be concurrent with the seizure or entry upon private property under the authority of the State. The government is bound in such cases, to provide some tribunal for the assessment of the compensation or indemnity, before which each party may meet and discuss their claims on equal terms; and if the government proceed without taking these steps, their officers and agents may and ought to be restrained by injunction. An injunction was granted by the court of chancery in *Gardner* v. *Village of Newburg*, and it was also sustained by the supreme court of Louisiana in a like case, 2 Johns. Chy. Rep. 162; *Henderson* v. *Mayor, &c., of New Orleans*, 5 La. 416. The civil Code of Louisiana article 489 had declared, that there must be the *previous* indemnity, and so did the civil Code of Napoleon article 445, and the constitutional *charter of Louis XVIII*. The provisions of our American Constitutions are essentially the same, though not in the same words precisely, and it would seem to require the same.

52

construction.   Several of them declare, that private property shall not be taken for public use *without full compensation being made*.   The settled and fundamental doctrine is, that governments have no right to take .private property for public purposes without giving a *just compensation*; and it seems to be necessarily implied, that indemnity should, *in cases which will admit of it*, be previously and equitably ascertained, and be ready for reception concurrently in point of time with the actual exercise of the right of eminent domain.   See *Thompson* v. *Grand Gulf R. R.*, 3 How. 240; *Lyon* v. *Jerome*, 26 Wend. 497;   12 Serg. & R. 366, 372;   20 Johns. Rep. 745;" also 2 Kent's Com. side page 339, 340, top page 399, 400 of 8th edition.

These views have been very generally approved by the judicial decisions in the United States, and especially by the decisions binding on this Court as authority.   Thus in *Tuckahoe Canal Co.* v. *Tuckahoe Railroad Co.*, 11 Leigh 77, 78, Tucker, P., says : "Is it necessary to the validity of the act that compensation shall be provided *before* the property can be taken?   The Constitution provides, that the Legislature shall pass no law whereby private property shall be taken for public uses without just compensation, and although there is no express requisition that the act which invades the right shall provide the indemnity, yet after much reflection I incline to the opinion that it should do so.   The instances which may occur *flagrante bello* of impressment and destruction of property, though at first view they may indicate a different construction, yet are rather to be referred to the necessities which war imposes, where the safety of the State is the supreme law, and justice is silenced by the din of arms."

The Court of Appeals of this State has frequently approved of injunctions awarded by circuit courts *enjoining* the taking of land for public use before the payment of just compensation.   See *Freshwater* v. *Pittsburgh, Wheeling and Kentucky R. R. Co.*, 6 W. Va. 504 ; *Pierpoint* v. *Town of Harrisville*, 9 W. Va. 218; *Boughner* v. *The Town of Clarksburg*, 15 W. Va. 399.   But while a corporation will be enjoined from *taking* private property for public use without having first instituted under the statute-law the proper proceedings for

condemning it, yet if this has been done and a report made by the commissioners, the corporation on paying the amount reported to be such just compensation for the land proposed to be taken, though this report be excepted to by the land-owner as not ascertaining fairly what is a just compensation, such corporation is expressly authorized by sec. 18 of ch. 42 of our Code, p. 264, as well as by sec. 18 of ch. 18 of the Acts of 1881, to take possession of the land condemned. But by sec. 2 of ch. 42 of the Code, p. 265, as well as by sec. 22 of ch. 18 of Acts of 1881, if by a subsequent report of commissioners this just compensation is increased in amount, and this report is approved by the court and judgment rendered against the corporation for the excess, the corporation at once ceases to have any right to occupy the land condemned till it pays this judgment. This legislation was, I presume, constitutional under our Constitution of 1863, though possession of land temporarily was taken before just compensation had been paid. Be that as it may, it seems to be clearly constitutional and just under our present Constitution, which provides that "private property shall not be taken by any company, incorporated for the purposes of internal improvement, *until* just compensation shall have been paid or *secured* to be paid to the owner."

These provisions of our statute-law seem to be in perfect accord with the spirit and language of our present Constitution. They secure to the owner, where his land is taken by a railroad for public use, the payment in cash before the railroad company takes possession its value ascertained by commissioners appointed by the court; but as this estimated value may not be a just compensation to the owner and has not been so adjudged by the court, the law very properly secures the payment of the residue of this just compensation, should there prove to be any, the moment it is ascertained, in what seems to me to be the most effectual manner; that is, by depriving the railroad company of the possession of this condemned land, for which they have paid in part, until they have paid the just compensation as ascertained by the court in full. This, it seems to me, is securing the payment of this just compensation more effectually than by requiring the railroad company to give bond and approved security for

its payment when it takes possession of the land, though under our present Constitution if the Legislature had chosen to provide this species of security, it would have been acting constitutionally as our Constitution is now worded. Indeed, had the Legislature gone still further and permitted a railroad company to take possession of the land it wanted to condemn, when it first instituted its proceedings to condemn the land, before even the appointment of commissioners, without paying anything to the owner on simply giving a bond, with approved security, to pay the just compensation when ascertained, it would in so doing be complying with the words of our Constitution; but it does seem to me that it would be violating its spirit, if the spirit of this constitutional provision is correctly set forth by Chancellor Kent in the quotation which we have made from him, and I think that the real spirit of it is correctly stated by him.

The railroad company should be required as our law requires it to pay the estimated value of the land taken before it is allowed to take possession of the land, and if this should prove not to be a just compensation, it should be required when it takes possession of the land to secure payment of the difference only between what is a just compensation and what it has paid in cash. Or what is still better it should be required as under our law to surrender the possession of the land the moment that the just compensation is ascertained, until this just compensation is paid. It seems to me that our statute-law carries out the true spirit of our Constitution, doing exact justice as nearly as possible to both the railroad company and the land-owner. It enables the railroad company to take possession of the land it needs at an early stage of the proceedings, and at the same time it gives to the land-owner before the railroad company takes possession the cash value of his land according to the estimate of disinterested parties, and furnishes to him the best security, that if it should be ultimately determined that his just compensation exceeds what he has recovered, the excess will be promptly paid to him as soon as ascertained. For even if the railroad company is then insolvent, those who are operating it will have to pay the balance of this just compensation, as otherwise being deprived of the possession of this land they must

stop all the operations of the railroad, which could not be done even for a brief time except at a very heavy loss.

Another question as to the true interpretation of 'this language, "private property shall not be taken for public uses without just compensation" found in the Constitution of the United States and in the Constitution of most of the States of this Union, and in our Constitution of 1863 has arisen, and has been the subject of considerable discussion and diversity of opinion among judges, and that is, the necessity of the word "taken" found in this clause of these Constitutions. Cooley in his work on Constitutional Limitations, side page 541, top page of the 5th edition 671, in answer to the question "what constitutes a taking of property?" lays it down that: "Any proper exercise of the powers of government, which do not directly encroach upon the property of an individual, or disturb him in his possession or enjoyment will not entitle him to compensation or give him a right of action," to support which proposition he refers to the following authorities: *Zimmerman* v. *Union Canal Co.*, 1 W. & S. 346; *Shrunk* v. *Schuylkill Navigation Co.*, 14 S. & R. 71; *Monongahela Navigation Co.* v. *Coons*, 6 W. & S. 101; *Davidson* v. *Boston & Maine R. R. Co.*, 3 Cush. 91; *Gould* v. *Hudson River R. R. Co.*, 12 Barb 616, and 6 N. Y. 522; *Radcliff* v. *Mayor of Brooklyn*, 4 N. Y. 195; *Murray* v. *Meneffee*, 20 Ark. 561; *Hooker* v. *New Haven & Northampton Co.*, 14 Conn. 146; *People* v. *Kerr*, 27 N. Y. 188; *Fuller* v. *Edgings*, 11 Rich. Law 239; *Richardson* v. *Vermont Central R. R. Co.*, 25 Vt. 465; *Kennett's Petition*, 24 N. H. 139; *Alexander* v. *Milwaukie*, 16 Wis. 264; *Richmond, &c., Co.* v. *Rogers*, 1 Duvall 135; *Harvey* v. *Lackawanna R. R.*, 47 Pa. St. 428; *Tinicum Fishing Co.* v. *Carter*, 61 Pa. St. 21; *Railroad Co.* v. *Richmond*, 96 U. S. 521.

In the last of these cases the court says: "That the appropriate regulation of the use of property is not 'taking' property within the meaning of the constitutional prohibition." See p. 529. As examples of what is not regarded as the "taking" of private property for public uses, we may refer to changes made by a municipal corporation in the grade of a street though adjacent lots be greatly injured, yet this is no "taking" within the meaning of this constitutional pro-

vision, and the owners of such lots where this is the only constitutional provision to which they can look for protection are entitled to no damages for such injury however great, their property not being taken. See *Callender* v. *Marsh*, 1 Pick. 433; *O'Conner* v. *Pittsburg*, 18 Pa. St. 187. And when a railroad is laid out along the line of a person's land, without actually taking any portion of it, but in consequence of such location of the railroad he is necessarily compelled to put up the whole of the partition fence one half of which his neighbor, whose lands have been so taken had been required to support, though he suffers by the location of the road an obvious injury, yet under this constitutional provision he is entitled to no redress, as his land has not been "taken." See *Kennett's Petition*, 24 N. H. (4 Foster) 139. So if a railroad company in constructing its road in a proper manner on its own land raises a high embankment near to and in front of a person's house, so as to incommode him in passing to and from his house, he is entitled to no compensation for this injury under the constitutional provision, which we are considering; for his land is not "taken." See *Richardson* v. *Vermont Central R. R. Co.*, 25 Vt. 465. But there are cases which under the principles laid down in these cases would lead to the conclusion, that in such a case the courts would hold that the party would be entitled to compensation, if the embankment put up in front of his house prevented or obstructed access from his lot to a public highway, as by these decisions the owner of land adjoining a highway has a right to the use of the highway, and this right is as much property as the land itself; that it is appurtenant to the land and is protected by the constitutional provision prohibiting the taking of private property for public use without just compensation. See *Haynes* v. *Thomas*, 7 Ind. 38; *Potzman* v. *Indianapolis, &c., R. R. Co.*, 9 Ind. 467; *Railroad Co.* v. *Dailey*, 13 Ind. 353; *Crawford* v. *Delaware*, 7 Ohio St. 459; *Street Railway* v. *Cumminsville*, 14 Ohio St. 523.

But admitting that the owner of land adjoining a highway or street has a right to the use of the highway, and that this right is as much property as the land itself, it does not seem to me that the building of an embankment between his house located near the highway and the highway, which incom-

moded him in his passage to and fro, could be regarded as a taking of his property or of his right of passage to the highway, though it might be damaging such property or right. If his passage to the highway was entirely prevented by such embankment, then his right of passage to the highway, his property as it is considered in these cases, would be taken, and he would be protected by this provision of the Constitution, if these cases are right in which it is held that this right of passage to the highway or street is property. So though the fee in a public highway be owned by an individual the granting to another of a ferry right over a private stream, landing on such highway, is not a taking of private property within this constitutional provision, as the landing place had been previously appropriated to public uses. See *Murray* v. *Meneffee*, 20 Ark. 561. But a material injury to the property of an individual, which deprives him of the use of it has been considered a taking within the meaning of this constitutional provision, though the corporation has taken no actual possession of his land. Thus the overflowing with water of the lands of a private person by the operations of a booming-company is a taking of his property within the meaning of this constitutional provision. See *Grand Rapids Booming-Company* v. *Jarvis*, 30 Mich. 308.

Upon the question, whether the construction of a railroad on the street of a town with the consent of the town-council, which consent has been authorized by statutory law in its discretion to be given, is a taking of the property of the owners of adjoining lots under the provision of the Constitution, which prohibits the *taking* of private property for public uses, there has been much controversy. In many States the answer to this question has been made to depend on, whether the owners of adjoining lots were or were not the owners of the fee in the street, or whether the fee of the street was owned by the town, or city, or by the public. It being held, that if the fee of the street is owned by the adjoining owners of lots, though the public have a right to use the same as a highway and for all purposes for which a street may be used by the public, yet if a railroad company is permitted to lay down a railroad track and to use steam as a motor for its cars by the consent of the council of the city or town, which

consent they were authorized to give by a statute-law by the Legislature, such adjoining owners of lots are entitled to compensation. See *Williams* v. *New York 'Central Railroad Company*, 16 N. Y. 97; *Wager* v. *Troy Union R. Co.*, 25 N. Y. 526; *Peet* v. *Chicago & N. W. R. Co.*, 20 Wis. 624; *Kaiser* v. *St. Paul, S. & T. F. R. Co.*, 22 Minn. 149; *Cox* v. *Louisville, N. A. & C. R. Co.*, 48 Ind. 178; *Indianapolis, B. & W. R. Co.* v. *Smith*, 52 Ind. 428; *I. B. & W. R. Co.* v. *Hartley*, 67 Ill. 439; *Stetson* v. *Chicago & E. R. Co.*, 75 Ill. 74; *Carpenter* v. *Oswego & Syracuse R. R. Co.*, 24 N. Y. 655; *Mahon* v. *New York Central R. R. Co.*, 24 N. Y. 658; *Ford* v. *Chicago & Northwestern R. R. Co.*, 14 Wis. 616; *Pomeroy* v. *M. & Chicago R. R. Co.*, 16 Wis. 670; *Imlay* v. *Union Branch R. R. Co.*, 26 Conn. 255.

In these cases and others like them there is generally no discussion as to whether the occupation by a railroad of a street, under these circumstances, is a taking of private property for public uses within the meaning of this word "taken" as used in the Constitution; but in some of them it is said in general terms to be a taking, when the fee of the street is owned by the adjoining land owners, and in others nothing is said on the subject. The discussion in such cases has generally been rather, whether this use of a public street by a railroad company is imposing on it an additional burden beyond that which was imposed on it, when the town, city or public originally obtained an easement in it as a street. When so held it was decided, that the owners of adjoining lots, who owned the fee in the street, were entitled to compensation, when it was occupied by such railroad, and when not so held it was decided, that they were not entitled to compensation, even though the fee was in the owners of the adjoining lots. See *Morris & Essex Railroad Co.* v. *The City of Newark*, 2 Stock. Chy. 352; Day, C. J., in his dissenting opinion in *Kucheman & Hinke* v. *C. C. & D. Railroad. Co.*, 40 Iowa 366; *Barney* v. *Keokuk*, 94 U. S. 340.

It seems to me therefore, that these cases which hold that when such railroad company under consent of the town-council occupies a street with its road the owners of adjoining lots, who own the fee in the street, are entitled to compensation, do so on the ground, that the railroad company

has taken their fee in the street; while those who hold, that under such circumstances the owners of adjoining lots are entitled no compensation, must hold, that the railroad company has not taken their fee in such street. I do not however regard the decision in either case as entitled to much weight with this Court, as there is generally in those cases which I have seen, no consideration of what should be regarded as the true meaning of the word "taking," as used in the Constitution with reference to the taking of private property for public use. It has either been expressly or tacitly assumed to be a taking or not to be a "taking," and no effort has been made to show by defining the meaning and limitation of the word "taking" as used in the Constitution, whether in such case the property of the owners of adjoining lots was taken, because with the consent of the town-council the streets were used for such railroad purposes, when the fee of the street was in these owners of adjoining lots. Where however the town, city or public is the owner of the fee in the street there are many decisions, which hold that the owners of adjoining lots though much injured by the laying down of such railroad under such circumstances in a street, are entitled to no compensation in States where the Constitution only provides for compensation, when private property is *taken* for public use. See *People* v. *Kerr*, 27 N. Y. 188; 37 Barb. 557; 38 Barb. 369; *Kellinger* v. *Forty-second Street Railroad Co.*, 50 N. Y. 306; *Sweet* v. *Buffalo, N. Y. & P. Railroad Co.*, 13 Harr. 643; *Carson* v. *Central Railroad Co.*, 35 Cal. 325; *Moses* v. *Pittsburg, Ft. Wayne & C. Railroad Co.*, 21 Ill. 516; *Indianapolis B. & W. Railroad Co.* v. *Hartley*, 67 Ill. 439; *Stetson* v. *Chicago & E. Railroad Co.*, 75 Ill. 74; *Patterson* v. *Chicago, D. & V. Railroad Co.*, 75 Ill. 588; *Atchison & N. Railroad Co.* v. *Garside*, 10 Kan. 552; *Colorado Central Railroad Co.* v. *Mollandin*, 4 Col. 154; *Clinton* v. *Cedar Rapids & M. Railroad Co.*, 24 Iowa 455; *Davis* v. *C. & N. W. Railroad Co.*, 46 Iowa 389; *Kucheman* v. *C. C. & D. Railroad Co.*, 46 Iowa 366.

In this last case a singular position was taken by a majority of the court, that if the fee of the street was in the owners of adjoining lots, and the railroad as in the case before us was located in the middle of the street, so that it is one

half on the fee simple of the land of the owner of the adjoining lot on one side of the street, and one half on the land of the owner of the opposite lot who had not sued, that the owner of the adjacent lot, who had sued was entitled to recover all damages which result proximately to him from the use by the railroad of his land, and that he is not confined to the actual value of the land taken, that is the land in the centre of the street, but nevertheless he is limited to the recovery of damages for the use of his own land, which extends only to the middle of the street, yet he is not entitled to the entire depreciation in value of his property caused by the location of a railway half upon his own land and half upon the land of an opposite owner. I can perceive no rule by which such abatement could possibly be measured.

These decisions, that the owners of adjoining lots along a street through which such railroad passes are entitled to no compensation when they do not own the fee of the street, must be based on the ground, that no matter how great is the injury to their property, it is no taking of their property within the meaning of the Constitution, that private property shall not be taken for public use without just compensation. The gross injustice of holding that the owner of an adjoining lot because he did not own the fee could obtain no compensation, though his property should be almost ruined by the construction of a railroad in the street with the consent of the town-council immediately in front of his house, and cutting a deep cut there or throwing up a high embankment, while one, who happened to own this valueless fee was entitled to full compensation, though the railroad inflicted on him but very slight injury, made certain courts astute to bring within the provision of the Constitution requiring compensation to be paid, when private property was taken for public use, the case where the railroad was in a street the fee of which was not in the owner of an adjoining lot. This was done by holding, that the owners of lots have a peculiar interest in the adjacent street, which neither the local nor the general public can pretend to claim; a private right in the nature of an incorporeal hereditament attached to the contiguous ground; an incidental title to certain facilities and franchises secured to them by contract and by law, and

which are as much property as the lots themselves, and are therefore as inviolable as the lots themselves. That such a steam railroad with the consent of the town-council given by authority of law took this property, this incorporeal hereditament, and that therefore under the Constitution forbidding private property to be taken without just compensation, these owners of adjoining lots, though they did not own the fee in the street, were entitled to just compensation for this taking of this incorporeal hereditament as well as for the injury done to their adjoining house or lot, just as the owner of the lot was entitled to compensation for the taking of his fee in the street and the injury to his adjoining house and lot. It is true, that this rather fanciful incorporeal hereditament was almost valuless, but so too was the fee in the street. These views were sustained by a number of cases. See *Lexington & Ohio R. R. Co.* v. *Applegate*, 8 Dana 294; *Haynes* v. *Thomas*, 7 Ind. 38; *Rowan* v. *Portland*, 8 B. Mon. 232; *Le Clerq* v. *Gallipolis*, 7 Ohio 477; *Cincinnati* v. *White*, 6 Peters 431; *Elizabeth, Lexington and Big Sandy Railroad Co.* v. *Combs*, 10 Bush. 382.

This last case however lays down the doctrine, that the use of a street for the site of a railroad track does not give a right of action to the owners of adjacent lots, unless it materially hinders the ordinary use of the street; but when such use does unreasonably abridge the right of the owners of lots to use the street as a means of ingress and egress an action for damages will lie against the railroad company. We can not learn from the case, whether the lot-owners in this case were the owners of the fee in the adjoining street or not, and the court evidently considered this as immaterial. And all the cases which are last cited, and some other similar ones, evidently regard it as immaterial in all cases whether the owners of adjoining lots were the owners of the fee in the street or not, because in either case they were entitled by this peculiar privilege as such lot-owners to the use of the street, which peculiar privilege was to be regarded as property taken by the railroad.

Others have held, what seems to us to be a more reasonable view, viz: That it was immaterial whether the owners of adjoining lots owned the fee or not. Their reason for this

opinion was, that though the fee of the street be in the owners of adjoining lots, yet as the town or city has a right to the use of the ground as a highway, and for various other purposes consistent therewith, such as the making of sewers and the laying of gas or water pipes and other purposes, for which a street may be legitimately used, which right to use the street is practically an exclusion of the owner of the fee in the street, so long as it is used by the town without obstructing the surface of the ground, and as this right of user on the part of the city or town is permanent, and may and in all probability will last forever, the reversionary right of the owner of the fee in the surface of the street is too remote and contingent to be of any appreciable value or to be regarded as property, which under the Constitution is required to be paid for when its use is appropriated by the public.  As countenancing this view, see *Tuckahoe Canal Co.* v. *Tuckohoe Railroad Co.*, 11 Leigh 78; *Barney* v. *Keokuk*, 94 U. S. 340; *The People* v. *Kerr*, 27 N. Y. 211.

A still different view has been taken in the case of *Morris & Essex R. R. Co.* v. *The City of Newark*, 2 Stockton's Chy. R. 352, and by Ch. J. Day in *Kuchman* v. *The C. C. & D. R. Co.*, 46 Iowa 366 (16 American Railway Cases 34) which is, that the authority to use a public highway or street for the purpose of a railroad, retaining the use of such highway or street for all ordinary purposes, subject only to the inconveniences of the railroad, is not such a *taking* of private property from the owner of the fee of the adjacent lands, though he owns the fee in the street, as is contemplated by the provision of the Constitution forbidding private property to be taken for public use without just compensation.  The easement of the highway or street is in the public, although the fee is technically in the adjacent owner.  It is the easement only which is appropriated, and no right or title of the owner of the fee in the street is interfered with by the railroad.  This position though it appears to be very forcible does not seem to have been often taken by judges.  I think however, that the reason why it has been often ignored without even an attempt to answer it is capable of explanation, and it will be hereinafter explained according to my views.

 According to some of the decisions, to which we have

referred, whether the owner of an adjoining lot is entitled to compensation when a steam railroad passes through a street with the permission of a town-council, given under an authority conferred on the town-council by an act of the Legislature, depends upon whether the adjoining land owner owns or does not own the fee in the street. This conclusion of these courts denied by others has given rise to elaborate discussions as to whether the fee of streets was in the owner of the adjoining land, in the grantor who granted these adjoining lands, in the towns or cities or in the general public; and while there has been a diversity of opinion on these questions the weight of authority appears to sustain the following positions.

Whether the fee in the highway or street is in the owner of the adjoining lot or in the original grantor or in the town or city is a question of interpretation or interest. It depends upon the interest of the parties to be gathered from the description of the premises conveyed, read in connection with other parts of the deed, and by reference to the situation of the lands and the condition and relation of the parties to those and other lands in the vicinity. If a highway is established through one's lands the fee continues in the original owner of the land, and if the highway is discontinued the exclusive use and ownership reverts to the original owner. Some have attempted to draw a distinction between highways in the country and streets in a town, based on the greater public inconvenience of permitting the fee of streets to be owned by individuals. But while the public or town authorities unquestionably have a right to use streets in a town for many purposes, for which a highway in the country could not be legitimately used, and while the easement of the public in a street in a town is more extensive than the easement of the public in a road in the country, yet I apprehend that, when unaffected by statutory provisions, which is often the case, the fee in the streets of a town and in a public road in the country would be in individuals or in the public authorities of the town or county, according to the interest of the grantors in the deed on the principles above stated. In either case the grantor may sell to the middle of the county road or to the middle of the street, or he may sell to

the edge of the county road or to the edge of the street, and in either event what he has done is merely a question of construction and interpretation.

There are authorities which hold, that if the owner of land in a town opens a public street in it, and sells a lot on each side by such boundaries as bring them only to the edge of the street, the fee of the soil covered by the street remains in him and descends to his heirs. This conclusion is reached because it is said, that one piece of land can not pass as appurtenant to another, which is certainly true, and hence it is said the fee of the street cannot pass as appurtenant to the adjoining lots. This would seem to be true. But on the other hand it is said to be a settled principle, that in matters of boundaries, a reference to monuments existing on the soil controls a description by courses and distances, because the purchaser supposes his grant extends to these natural limits, which he can see and judge of, and he supposes the courses and distances correspond with them; this he takes to be so upon trust. Now a highway or street is quite as much a *monument* for the purposes of making a boundary in legal signification as a stream, a rock or a tree. At what precise point or place in this monument of the highway is the legal boundary, always an ideal line, to be found? When any other monument is called for, the legal terminus of the grant is at the central line of the monument, whether it be a tree, a rock or a stream, and it should be the same when the monument is a highway or street. The middle of the highway or street is the legal boundary though the distance only brings the lot to the line of the highway or street, that is, to the monument the center of which is the true boundary.

As I regard it as immaterial in this as well as in all cases where the question is, whether owners of adjoining lots are entitled to compensation from a railroad company legally occupying a street, whether the lot-owners own the fee of the street to its centre or whether they claim to the edge of the street, I will not cite the authorities on this controverted question, but will content myself with stating the above general views. I will cite however the Virginia authorities bearing on the subject. They are *Mayo* v. *Murchie*, 3 Munf. 358; *James River & Kanawha Co.* v. *Anderson*, 12 Leigh 278; *Skeen* v.

*Lynch,* 1 Rob. R. 186; *Boling* v. *Petersburg,* 3 Rand. 563; *Warwick & Barksdale* v. *Mayo,* 15 Gratt. 528; *Norfolk* v. *Chamberlain,* 29 Gratt. 534; *Talbert* v. *R. R. Co.,* 31 Gratt. 685; see also *Wheeling* v. *Campbell,* 12 W. Va. 36.

This question has been further complicated by legislation, many States by statutes declaring, that the fee where lands are dedicated by individuals to towns and cities for streets shall be in such towns and cities; and as most of the towns in Virginia, as well as a number in West Virginia, have been created by special statutes, it is in argument insisted, that in many cases a true construction of these statutes should lead the courts to the conclusion, that the fee of the streets of these towns is in the towns, and not in the owners of adjoining lands. Doubtless the town of Point Pleasant was so created, but the special statute creating it was not referred to in the pleadings in this cause nor in the proof, and I cannot say whether it would affect the question as to whether the streets are vested in fee in the corporation of Point Pleasant or belong to the owners of adjacent lots. It is well therefore that I have reached the conclusion that in this case it is immaterial where this fee is vested. Streets are public highways under the control of cities and towns, but subject always to the paramount authority of the State. See *Southwest. R. R. Co.* v. *Philadelphia,* 47 Penn. St. 314. The Legislature has power to authorize the building of a railroad on the streets of a town or city. *Tennessee and Alabama R. R. Co.* v. *Adams,* 3 Head (Tenn.) 596. Therefore when the Legislature by statute directly authorizes a company to build a railroad in the street of a town, either with or without the consent of the town-council, such railroad company so long as it keeps within the scope of the power granted, is completely protected from indictment for a public nuisance and from proceedings either at law or in equity in behalf of the public therefor. See *People* v. *Law,* 34 Barb. (N. Y.) 494; *Com.* v. *Reed,* 34 Penn. St. 275; *King* v. *Pease,* 4 B. & Ad. 30. But it is only when the nuisance is a *necessary* and *probable* result of the act done in pursuance of legislative authority, that the grant operates as a protection against indictment or suit therefor. This is well illustrated in *Richardson* v. *Vermont Central Railroad Co.,* 25 Vt. 465, in which

it was held, that when the defendant by legislative authority made an excavation on its own land so near the plaintiff's land that it subjected him to great inconvenience in his egress and ingress, and the plaintiff's land slid into the excavation, the railroad company was not liable for the nuisance occasioned by its obstruction to the plaintiff's ingress into and egress from his land, but it was liable for the injury resulting from the sliding of plaintiff's land into this excavation. Bennett, J., said: "There is no pretense that the railroad company in digging the excavation on their own land were in the wrong; neither in so doing did they remove any of the plaintiff's soil directly, *but the slide was a consequence of it.* * * * * They cannot justify the removal of the plaintiff's soil from any powers attempted to be conferred upon them, either by their charter or the general railroad law." Though the railroad company was properly held not liable for the nuisance produced by this excavation and the injury to the plaintiff's adjoining property thereby interfering with his passage to and from it, yet it would be otherwise held here because of a provision in our present Constitution prohibiting private property from being *damaged* for public use without just compensation, which provision is not in the Vermont Constitution.

Judge Redfield after reviewing the cases in which it was held, that if a railroad company by proper legislative authority builds its road in a street of a town it is liable to compensate the owners of adjoining lots for damages to their lots, the necessary result of making their road where these parties own the fee in the street, but it is not liable for such damages if the fee of the street is owned by the town, says: "There is great difficulty, as it seems to us, in supporting important distinctions upon the fact, that the fee was originally taken for the use of the public instead of a mere easement. If the fee is appropriated or dedicated it is for a particular use only; and it is a *conditional* fee—a fee on condition that the land continue to be occupied for that purpose. The practical difference in the cases is, that when the fee is taken the possession of the original owner is excluded; and in the case of city streets, when there is occasion to devote them to many other purposes besides those of passage, but neverthe-

less not inconsistent, such as for the laying of water and gas-pipes and the construction of sewers, the exclusion of any private right of occupation is important, and will sometimes raise controversies and litigation.   But to say that when a man has declared a dedication for a particular use, under a statute which make a dedication the gift of a fee, he thereby makes it liable to be appropriated to other purposes, when the same could not be done if a perpetual easement had been dedicated, seems to be basing important distinctions upon a difference which after all is more technical than real, and which in any view does not affect the distinction made." See Cooley's Constitutional Limitations, 5th edition, note 3 on top page 687, side page 556.

The distinctions taken too between the cases where the owners of the lots adjoining the street, on which such rail-road is located, own the fee of the street by the true construc-tion of their title-deeds, and where the original grantor owns the fee by the true construction of the title-deeds of the pres-ent owners of the adjoining lots whereby in the one case full compensation is allowed for all damages done to the owners of the adjoining lots, and in the other case no com-pensation is allowed such lot-owners seems to me eminent-ly unjust, and I think I can show, that it is merely fanciful and founded upon no solid legal principle.    This ' dis-tinction is rendered the more outrageous because in almost every case these adjacent lot-owners would not until the court decided the point know, whether they owned the fee in the street or whether it was owned by the original grantor; first because practically till the making of such railroad in the street it was a matter of no importance to them whether they owned the fee in the street or not, as they had the same use of the street in either case; and secondly because in many cases it would require the decision of a court to determine where the fee of the street really was.    There must be some reason why so many courts, whose judges were eminent jurists, should have drawn so many nice distinctions, which we think lead to gross injustice, and which cannot really be sustained by sound reasoning.    We think we can perceive what has led to this great conflict of authority and to these over-nice distinctions.

Judge Redfield in his work on the Law of Railroads 4th edition, top page 312, vol. 1. admits, that at first the courts in this country almost universally held that the owner of the fee in a street and of the adjoining lot was entitled to no compensation for injury to his lot by the legal construction of a railroad in the street, and that they generally held subsequently, that when any railroad, whether a horse railroad or a steam railroad, was laid down in a street the adjoining lot-owners were entitled to 'compensation for injury to their adjoining lots. But in endeavoring to explain the change in the decisions it seems to me, that he falls into error. In the first place the change in the decisions was greater than he points out. For at first they held generally, that though the adjoining lot-owner held the fee in the street he was entitled to no compensation, when a railroad was laid down by proper authority in the street, no matter what was the character of the railroad. Subsequently they frequently held, that such adjoining lot-owner whether he owned the fee in the street or not was entitled to compensation, if a railroad was legally laid down in the street, whereby his adjoining lot was injured. Redfield in the paragragh to which I have just referred says: "At first it was so common to designate steam-railways as only an improved highway, that the courts, almost universally in this country held the owner of the fee entitled to no additional compensation by reason of such railway either across or along their routes."

These original decisions I think were right, for the reason assigned in the case of *Morris & Essex Railroad Company* v. *The City of Newark*, 2 Stockton's Chy. (N. J.) 352. The court in that case uses this language: "It follows that where a public highway is used in common with the public, under the sanction of legislative authority, it may enjoy such use without making compensation to the owners in fee of the adjacent lands, and that the Legislature may authorize such use without providing compensation to the owners in fee of the adjacent lands, even under the existing Constitution of the State, which provides that individuals or private corporations shall not be authorized to take private property for public use without just compensation first made to the owners. The authority to use a public highway for the purpose

of a railroad, retaining the use of such highway for all ordinary purposes, subject only to the inconvenience of the railroad, is not such *taking* of private property from the owner of the fee of the adjacent lands as is contemplated by this provision of the Constitution. The easement of the highway is in the public, although the fee is technically in the adjacent owner. It is the easement only which is appropriated, and no right or title of the owner is interfered with." The adjoining lot-owner, though he own the fee of the street, not being protected by the Constitution of the State of New Jersey nor indeed by the Constitution of any State in this Union at that time, he was entitled to no damages or compensation for injury to his property by such company authorized to construct its road in such street, and he could recover in no court any damages or compensation, unless the common law gives him an action in such case.

Now it is well settled and universally admitted, that where a person or a corporation is vested with authority by the Legislature to do an act in regard to which they will be perfectly protected from all responsibility, and will be liable to no suit either at law or in equity, provided that what they are authorized to do is done carefully and skillfully, though without such authority it would have been a nuisance, but if done carelessly and unskillfully and damages result from such carelessness and want of skill, they will be responsible. See *Biscoe* v. *Great Eastern Railway Co.*, L. R. 16 Eq. Cas. 640; *Penny* v. *Southeastern Ry. Co.* 7 E. & B. 660; 26 L. I. Q. B. 225; *Hammersmith & City Ry. Co.* v. *Brand*, L. R. 4 H. L. 171; *City of Glasgow Union Ry. Co.* v. *Hunter*, L. R. 2 S. & D. 78; *Radcliff* v. *Mayor*, 4 N. Y. 195; *Bellinger* v. *New York Central R. R. Co.*, 23 N. Y. 42; *Newark Plank Road Co.* v. *Elmer*, 1 Stockt. 760; *Rigney* v. *City of Chicago*, 102 Ill. 70 & 71    It is obvious therefore that when a railroad company is authorized by the Legislature by an express statute or when authorized by a town-council by the authority of a legislative statute, which is the same, it can not either at common law or in a court of equity be sued or enjoined, if it is proceeding to build its road in such street carefully and skillfully, and in a manner least injurious to others. And if the Constitution gives the owner of an adjoining lot no

redress, the injury he sustains must be regarded as *damnum absque injuria.*

Until the year 1870 there was no Constitution of a single State in this Union, which gave the owner of an adjoining lot redress for such injury, no matter how grievous it might be. Thus in many cases private property was greatly damaged for the public use, and the owner of such property had no redress, though the Constitution of each State in the Union furnished him redress if his private property was *taken* for public use. It was I apprehend the gross injustice and wrong done an individual by seriously damaging his private property without compensation, which induced many of the courts after construing for a time the Constitution in the manner in which the New Jersey court did in the case above cited, to abandon this just legal construction and to hold, that if the adjoining lot-owner owned the fee in the street, he might recover of a railroad company, which built its railroad in the street by authority of the Legislature, or enjoin it from building such road. This they could only legally do by showing that the reasoning of this New Jersey court was unsound, and that such railroad company *took* the private property of these lot-owners, and not simply the easement of the town in the street. But this they did not do. In some cases they assumed, that this fee of the lot-owner in the street was taken, though it was obvious that his title or use of this fee was in no manner disturbed much less taken. But in many cases nothing was said about the taking of his fee in the street, though this was the only ground on which such action or injunction could be legally based; but these courts contented themselves with showing that the street was being used or was about to be used in a different manner from what was or could have been contemplated by the parties, when the street was originally opened or dedicated as a street, or, as they called it, this fee of the adjoining land-owner was subjected to additional servitude, and hence they argued he was entitled to damages or to enjoin the railroad company from subjecting this fee to this additional servitude.

It is difficult to comprehend what possible damage was sustained by the owner of the fee as such of the land, on which the street was located. Suppose such owner of this

fee had owned no adjoining lot, but simply the fee of the
land in the street subject to the easement of the public to use
it perpetually as a street, as well might be the case, can any
one conceive of his claiming damages on account of this sup-
posed additional servitude or of his enjoining the building of
the road because of this supposed additional servitude? He
has suffered no damage either real or imaginary. He could
have no use of the surface of the ground covered by the rail-
road track so long as the street was kept open as a street,
and whenever it was closed as a street the portion of it owned
by him, we have seen, would revert to him. The building
of the railroad on it would in no manner prevent this rever-
sion, for the railroad did not pretend to own the fee of the
land, but only a user of it for purposes of passage to and fro,
which it got from the town-council, and the moment their
right to so use it ceased that of the railroad must necessarily
cease. So that this owner of the fee in the street cannot in
any possible contingency be subject to any loss or incon-
venience, and I have no idea that any court would permit
him as the owner of such fee either to sue or enjoin the rail-
road. It was only when he owned this fee as well as the
adjoining lot that they countenanced such suit or injunction
and it was allowed simply to give him compensation for the
injury to his adjoining lot. But we have seen he was enti-
tled to no compensation therefor because it was *damnum
absque injuria.*

But many courts having by this device done what they
thought was common justice to the adjoining lot-owner,
when he happened to own the fee in the land covered by the
street, seemed to be at their wits' end. and could see no way
of awarding damages or giving compensation to the owner
of adjoining lots, who did not happen to own the fee in the
land covered by the street. Yet it was obvious, that justice
required that he should recover damages or be allowed an
injunction when his adjoining lot was injured, if his neigh-
bor who happened to own the fee in the land covered by the
street was to be allowed to recover damages or obtain an in-
junction against the railroad company. But after a while
some of the courts found an ingenious device, by which they
would be able to correct this gross injustice, and put the ad-

joining lot-owner who happened not to own the fee in the street on the same footing, as these other courts had put the adjoining lot-owner who owned the fee in the street. This notable device was, that they held that "the adjoining lot-owner had a peculiar interest in the street, which neither the local nor the general public can pretend to claim; a private right in the nature of an incorporeal hereditament legally attached to their contiguous grounds and the erections thereon; an incidental title to certain facilities and franchises assured to them by contracts and by law, and without which their property would be of comparatively little value; an easement appendant to the lot *is as much property as the lot itself*." Assuming this as a basis they reasoned thus: If the railway track is an obstruction to the convenient access to the houses and other improvements of the lot-owners, then this peculiar interest of this lot-owner in the street, which neither the local nor general public can pretend to have, is taken by the railroad company, and therefore the lot-owner is entitled to compensation, as private property has been taken for public use.    To my mind all this reasoning is more untenable even than that, which some of the courts had held sufficiently good to justify the giving of compensation to lot-owners, who happened to hold the fee in the land in the street.

In the first place it is very difficult to tell what is meant by " this peculiar interest of the lot-owner, who owns no fee in the land in the street, which neither the local nor the general public can pretend to claim." It certainly does not refer to the fact, that this lot-owner uses this part of the street oftener and to a greater extent than the general public.    For any member of the general public has a right to use this portion of the street just as often and as much as he pleases; just as often and as much as this owner of the adjoining lot. The only peculiar interest of such lot-owner in such street that the most ingenious have been able to suggest, so far as I know, is that they have a right to have this street kept perpetually open, while one of the general public could not prevent the town-council from closing it if they pleased. Let this be admitted, how does the location of a railroad in the middle of this street take away or affect the right to have

this street kept perpetually open? How does the appropriation of a certain portion of the street to be used by a railroad as a general passage for the general public over a certain part of this street prevent the street from being kept open as a street? If then this right to have the street kept open perpetually is an exclusive right, and can be regarded as an incorporeal hereditament, as private property within the meaning of the Constitution, I can not see how the railroad company has taken this private property. It has not acquired and the original owner has not lost it. It may be that another and a very different thing, his habitual use of this street, which certainly is not private property, may be injuriously affected, but such injury by a railroad properly constructed by leave of the Legislature in this State is as we have seen *damnum absque injuria.* I am pleased to say that many courts have refused to adopt either of these devices, and I am still more happy to say, that in our State by our last Constitution the courts of this State are enabled to avoid the injustice and wrongs, which these devices were invented to escape without being driven to such devices. Our Constitution has made the most ample provision to meet these cases, and enable our courts to do full justice not only in all such cases, but also in many other cases where the common-law entirely fails to provide any remedy.

The evil to be remedied was, that the State as a sovereign had an unlimited right to appropriate and control individual property of any description for the public benefit as public safety, necessity, convenience or welfare might demand. This right was inherent in all governments, and it therefore required no constitutional provision to give it force. See *Brown* v. *Beatty,* 34 Miss. 227; *Taylor* v. *Porter,* 4 Hill 143. As Hogeboom, J., said in *People* v. *Mayor, &c., of New York,* 32 Barb. 112: "Title to property is always held upon the implied condition that it must be surrendered to the government, either in whole or in part, when the public necessities evidenced according to the established forms of law demand." The Constitution of this State and of every State in the Union as well as the Constitution of the United States provides, that private property shall not be taken for public use

without just compensation.   In the exercise of this right of
eminent domain it was well settled, that it need not be exercised
directly by the State, but by legislative authority.   It might
be exercised not only by political divisions of the State, but
also by individuals and by corporate bodies authorized by
the Legislature to take private property for the construction
of works of public utility, and when duly authorized by the
Legislature so to do their private pecuniary interest would
not preclude their being regarded as public agencies in
respect to the public good, which was sought to be accom-
plished.   See *Beekman* v. *Saratoga & Schenectady R. R. Co.*, 3
Paige 74; *Petition of Mount Washington Road Co.*, 35 N. H.
141; *Raleigh, &c., R. R. Co.* v *Davis*. 2 Dev. & Bat. 451;
*Bradley* v. *N. Y. & N. H. R. R. Co.* 21 Conn. 294.

If any corporation by legislative authority took private
property for public use the Constitution of every State pro-
vided, that just compensation should be made therefor.   But
it often happened, that corporations and individuals in thus
taking the private property of one person or corporation for
public uses damaged the private property of other persons,
whose private property they did not take.   They often did
that, which but for the legislative authority conferred on
them, would have been a public or private nuisance.   And
it was well settled, as we have seen, that if they kept within
the scope of the power granted to them, they were completely
protected from either indictment or suit by private persons
either in law or equity, provided they exercised their power
in good faith and with care and skill, and that they damaged
individuals whose property was not taken no more than was
the necessary and probable result of so doing the act in pur-
suance of legislative authority.   But when the work was done
with care and skill great injury was often sustained on
account of damages done persons, whose property was not
taken.   This injury was regarded by the law, as we have
seen, as *damnum absque injuria*, and such persons whose prop-
erty was not taken but only damaged for the public use,
were entitled to no compensation.   This was justly regarded
as a great evil, and to mitigate it the courts frequently
resorted to what I conceive were forced constructions and
unwarranted devices, whereby persons whose property was

so damaged for public use were permitted to recover compensation, their property being by such forced constructions and devices regarded as taken, when in fact it was not but only damaged. Still there were many cases where private property was damaged for public use, where the courts by no device or construction could hold that the private property had been taken for public use, and the courts were in such cases reluctantly compelled to decide, that the owners were entitled to no compensation, however much their property was damaged for public use.

Our Constitution of 1872 wisely furnished a remedy for this great evil by providing, that private property shall not be damaged for public use without just compensation. The language of the provision is : "Private property shall not be taken or damaged for public use without just compensation ; nor shall the same be taken by any company incorporated for the purpose of internal improvement, until just compensation shall have been paid or secured to be paid to the owner ; and when private property shall be taken or damaged for public use or for the use of such corporations, the compensation to the owner shall be ascertained in such manner as shall be prescribed by general law; *Provided,* that when required by either of the parties such compensation shall be ascertained by an impartial jury of twelve freeholders." See article III., sec. 9 of Constitution, Acts of 1872-73, pp. 6, 7.

The first question in this case is, whether the plaintiff is entitled to just compensation under this provision of our Constitution for the damages alleged to have been sustained by her by the building or the proposed building by the Point Pleasant and Ohio Railroad Company of its approaches to the railroad bridge across the Ohio river, the said approaches or trestling being in the centre of Seventh street in the town of Point Pleasant, and about thirty feet high, and the lot of the plaintiff being on the corner of Main and Seventh streets, and having on it a dwelling-house opening on Main street as its front. On this bridge and trestling a railroad track is to be built. Permission was given said railroad company by the town-council of the town of Point Pleasant, on September 29, 1881, by an ordinance of said town to so occupy said street. This ordinance granted to this railroad

55

company a right of way for the erection, construction and perpetual maintenance of a railroad bridge across the Ohio river upon and along Seventh street. The record and evidence shows conclusively that in building this trestling and approaches as well as this bridge, that the power conferred on this railroad company is being executed in good faith with care and skill, and that in building the same it is exercising the highest degree of care to prevent, as far as possible, injurious results and damage to the lot-owners on said Seventh street, and that this trestling could be neither located nor built in any manner whereby less damage would be done to the lot-owners on Seventh street, and that the making of this trestling in Seventh street at the height which it has been made, is absolutely necessary in order to reach the bridge, which is necessarily a high one, as otherwise it would interfere with the navigation of the Ohio river.

The evidence in reference to the amount of damages, which the plaintiff will sustain by the building of this trestle is very conflicting. The inference to be drawn from the testimony of the plaintiff's witnesses is, that it will be very considerable, one of them estimating it at fifteen hundred dollars. The evidence on behalf of the defendants leads necessarily to the conclusion, that the damages sustained by the plaintiff from the building of the trestle in Seventh street would be very slight, as it would not obstruct the free use of Seventh street for all purposes, for which it is now or ever has been or is ever likely to be used; that a wagon can readily be driven through it in the rear of the plaintiff's lot, and that by reason of open spaces in this trestle thirty feet wide, at intervals of every thirty feet, wagons passing in opposite directions could without any possible interference or danger pass each other, the one going in the one direction passing through one of these open spaces and taking the opposite side of Seventh street, the narrowest portion of Seventh street between the trestle and the sidewalk exceeding fourteen feet, a space most ample for the passage of any vehicle, and there could never be a necessity for two vehicles to pass in this width of the street as without difficulty the vehicle coming in one direction could occupy the street unobstructed on the north side of the trestle, and the vehicle coming in

the opposite direction the portion of the street unobstructed on the south side of the trestle. Yet this trestle is spoken of by the plaintiff's witnesses as a most serious obstruction to the ingress and egress to and from the rear of plaintiff's lot, and some of the witnesses say, that it is so serious as to necessitate the opening of a road from Main street through the front lot of the plaintiff in order to get access to the rear of her lot, though the maps filed in the cause and the actual facts proven with reference to the location and mode of constructing this trestle, and the measured width of that portion of Seventh street left unobstructed on each side of this trestle demonstrate beyond doubt it seems to me, that this trestle will be a very slight if it be even an appreciable obstruction to the free ingress and egress to and from the rear of the plaintiff's lot. The simple erection of this trestle then would be a very slight if an appreciable injury to the plaintiff's lot, and the only real injury of any extent, which will result to the plaintiff's lot by the construction and running of this railroad will be the inconvenience to her resulting from the running of trains near her residence. Even this will be less than the inconvenience, which would ordinarily result from this source, as the cars when near her house will be on a trestle thirty feet high, and no possible danger of injuring any one by running over him or killing him can exist. Doubtless the noise and smoke and danger of fire from sparks would be some annoyance to the residents of the house of the plaintiff, provided it is situated on or near the corner of Seventh and Main streets. But the record does not show where her house is located on her lot, and this noise and smoke and appreciable danger of fire may or may not be an annoyance to the residents in her house or to her as the owner thereof.

It is obvious therefore, that the damage, if any, which the plaintiff will suffer by reason of the construction of this railroad in the manner it is proposed will be about as little as would be inflicted on any lot-owner on a street in any town through which a railroad runs. Now it is certainly true, that the question, whether the plaintiff has in such a case as this a right to have redress of some sort for the damages she may sustain, if any, can in no manner be affected by the amount of such damages, yet as we shall presently see the

mode and manner of her redress is to a large extent con-
troled by the amount and character of the damages, which
are sustained.   I have therefore deemed it necessary to state
my views of the amount and character of her damages in
this case, as shown by the evidence in this record.

In *Stone* v. *Fairbury, Pontiac and Northwestern Railroad
Company*, 68 Ill. 394, (18 Am.) it was decided, that when
smoke and cinders are thrown from the engines of a railroad
company upon the plaintiff's property and dwelling on a lot
adjoining a street, through which a railroad runs, that the
company is liable in an action on the case for the damages
thereby occasioned by reason of the provision in the Consti-
tution of Illinois of 1870, which likewise provided, that pri-
vate property should not be taken or damaged for public use
without just compensation.   Under the reasoning of this
decision, it might be questionable, whether the mere noise
produced by the running of the cars would be such an injury
as the plaintiff could legally complain of, as the court seems
to think that the injury must be a physical injury to the lot.
I am not, however, prepared to say, that in an action on the
case under the provisions of our Constitution the damages
must be immediate or physical in order to justify a recovery
in an action on the case.   On the contrary this seems to be
too narrow a construction of the meaning of the word dam-
ages in this provision of our Constitution.   This limitation
of its meaning was disapproved afterwards in *Rigney* v. *City
of Chicago*, 102 Ill. 64, where it was held, that a right of
recovery in an action on the case under this provision of the
Constitution existed in every case "where there was a direct
physical obstruction or injury to the right of user or enjoy-
ment of private property, by which the owner sustains some
special pecuniary damage in excess of that sustained by the
public generally, which by the common-law in the absence
of any constitutional or statutory provision gives a right of
action."

I do not deem it proper in this case to say, what is the true
meaning of this word damages contained in this provision of
our Constitution or to undertake to state in what cases dam-
ages may be recovered generally by virtue of this provision.
But will content myself with saying, that if a railroad is by

the consent of a town-council built through a street of a
town, it will be liable for damages done to adjoining lots
in all cases, in which it will be liable, had it not as the law
stood before the adoption of this provision of our Constitu-
tion been protected from responsibility by virtue of the leg-
islative authority to build such railroad in the street.

In *Johnson* v. *The City of Parkersburg*, this Court decided,
that an action on the case lay against a city, which by chang-
ing its grade by raising or depressing its streets permanently
damaged private property, though prior to the adoption of
this provision of our Constitution no such action could be
sustained, for such injury was *damnum absque injuria*. This
decision accords with the spirit of the decision in Illinois
rendered in 1882, in the case of *Rigney* v. *City of Chicago*, 102
Ill. 64. But it does not accord with the opinions of the court
in *Stetson* v. *Chicago & Evanstown R. R. Co.*, 75 Ill. 74, and
*Chicago, Milwaukee & St. Paul R. R. Co.* v. *Hall*, 90 Ill. 42.
If therefore the plaintiff in this case has sustained or will sus-
tain damages in consequence of a direct physical obstruction
to the right of user or enjoyment of her property on Seventh
street, caused by the railroad company which damages are
peculiar to her as the owner of this property, and in excess
of the damages or inconvenience sustained by the public gen-
erally, and which by the common law in the absence of any
legislative authority to build such road in said street could
have been recovered of the railroad company, she may sus-
tain an action on the case for such damages.

The next inquiry is, admitting that she has sustained
damage for which under our Constitution she has a right to
sustain an action, should she on the facts appearing in this
case be left to her common-law remedy or has she a right to
come into a court of equity and ask, that the railroad com-
pany be either perpetually enjoined from building its road in
Seventh street or enjoined until her damages have been as-
certained and paid to her? It is certainly true as I have
hereinbefore stated, that it is settled law in this State sus-
tained by several decisions, that if a railroad company enter
upon and take the property of any person, and begin build-
ing upon it a railroad, before it has paid a just compensation
to the owner, as agreed upon with him, or before such just

compensation has been ascertained and reported to the court by a commissioner in a proceeding to condemn the land, and before the payment of such just compensation as so reported, the owner may enjoin the railroad company from further proceeding to build its railroad on such land till such damages are paid, if so ascertained, or till they are so ascertained and paid. And the counsel for the plaintiff insist, that the plaintiff in this case owns the land to the centre of Seventh street according to its boundaries as set out in her title-papers, and this being the case, the railroad company has entered upon and taken her land lying in this street and has commenced building its railroad thereon, and therefore according to the decisions of this Court she is entitled to enjoin the company from further proceeding to build its road on her land, till the damages done to her as well as to her adjoining lot are first ascertained and paid to her. But we have seen, that according to our views, the railroad company has never taken any part of her land, that by the ordinance of the town-council of Point Pleasant the company obtained a right of way through Seventh street, which ordinance was passed pursuant to ch. 16 sec. 10 of Acts of 1881; that by this ordinance and the taking possession of the middle of said street to build its road the company acquired from the town of Point Pleasant a portion of their easement to use and control Seventh street, but they acquired and took nothing whatever from the plaintiff. Admitting that she owns the fee to the middle of Seventh street opposite her lot, as she contends is the fact, she still owns the same, and neither her title or possession is in any manner disturbed by the railroad company. It has always been subject to the easement of the public to pass and repass over it and to use it as a street, and subject to this easement she has as much the enjoyment and possession of the whole of Seventh street as she ever had. What the railroad company has taken it has taken from the town-council of Point Pleasant, a mere easement, and it has taken nothing from the plaintiff, and therefore under the West Virginia authorities referred to, she is entitled to no injunction. That it is true, that the railroad company has not taken anything from the plaintiff will be rendered still more apparent by an examination of our statute-law.

The statute-law in force, when the railroad company commenced its work in Seventh street of Point Pleasant is that which was enacted in 1881. Section 10 of chapter 15 provides: "No company shall occupy with its works the streets of the inhabited part of any city, town or village until the corporate authority thereof shall have assented to such occupation, unless such assent be dispensed with by special provision of law." And the language of section 50 of chapter 17 of Acts of 1881 is as follows: "Every corporation formed under this chapter shall in addition to the powers hereinbefore conferred have power "(then follow a number of powers not necessary to notice and at the sixth of these powers the act proceeds)" to construct its railroad across, along or upon any stream of water, street, highway, road, turnpike or canal which the route of such road shall intersect or touch  *  *  *  *  Provided, that in case of the construction of said railroad along highways, roads, turnpikes or canals, such railroad shall either first obtain the consent of the lawful authorities having control or jurisdiction of the same or condemd the same under the provisions of section 48 of this chapter." This condemnation gives the fee in the land to the railroad company.

Now it is obvious from these statutes, that a railroad company cannot condemn a street of a town nor can it even occupy it without the corporate authority of such town first consents to such occupation. It is plain therefore, that in this State no railroad company can ever acquire in the street of a town the fee thereof, though elsewhere it may acquire the fee. When it occupies with the consent of the authorities of the town the street of a town it acquires only a right of way through such street. This right of way is acquired without the consent of the lot-owners on such street, though they may own the fee of the land in such street, and had the Constitution or law contemplated, that they were to be compensated before such street could be occupied by such railroad is it not apparent, that the law would have provided for the condemnation of their fee in the street, as it did in other cases? The mere fact that the street is occupied by the railroad company without their consent and without any condemnation shows, that our view is correct, that corpora-

tions acquire from the town authorities a mere right of way, which right must necessarily terminate when the franchise of the town to use it as a street ceases by its being closed. They acquire nothing whatever from the owners of adjoining lots, but leave them with reference to their title and possession just as they found them. It is true their occupation of the street may damage the owners of adjoining lots, but it will damage them just as much if they did not own the fee of the street as if they did own it. So as the simple owners of the fee of the street their property in the fee of the street is not only not taken, but not even damaged.

The plaintiff therefore in this case has no right to obtain an injunction against the railroad company by reason of her owning the fee in the street. If she has such right at all it is only by reason of her being the owner of a lot bordering on the street, and she has thereby sustained or will sustain peculiar damage as such lot-owner by reason of the threatened occupation of the street by the railroad. Does this give her a right to such injunction? The answer to this question must depend upon the construction of section 9, article 3 of our Constitution, Acts of 1872–73, p. 6. In constitutional doc. No. 24, page 4, printed at the end of Journal of Constitutional Convention of 1872 will be found this provision of our Constitution, as reported by the committee on the Bill of Rights with the amendments made thereto in the committee of the whole. The amendments made by the committee of the whole of the convention are in italics enclosed by inverted commas, and those stricken out are in brackets, and the entire section with the amendments made by the committee of the whole and reported to the convention is thus shown. It is as follows: Private property shall not be taken or damaged without just compensation, nor shall the same be taken (or damaged) by any company incorporated for the purposes of internal improvement until just compensation shall (be) "*have been*" paid "*or secured to be paid*" to the owner; and when private property (is to) "*shall*" be taken or damaged for public use or for the use of such corporation the compensation to the owner shall be ascertained (by an impartial jury of twelve freeholders) in such manner as may be prescribed by "*general*" law; "*Provided, that when it is required*

*by either of the parties such compensation shall be ascertained by an impartial jury of twelve freeholders."*

A comparison of this with section 9 of article 3 of our present Constitution, Acts of 1872–3, page 6, will show what changes were made by the convention in the report of the committee of the whole, but I desire to call special attention to one amendment to the report of the committee of the whole, which was made by the convention, and inserted in the clause as it now appears in our Constitution. On March 13, 1872, the vote was taken on the motion to strike out the word damaged where it appeared the second time in the report of the committee of the whole. Their report reads "private property shall not be taken or damaged without just compensation nor shall the same be taken or damaged by any company, &c., until just compensation shall be paid, &c." It was proposed to amend it so that it should read: "Private property shall not be taken or damaged without just compensation, nor shall the same be taken by any company &c., until just compensation shall be paid." This amendment was passed, and the clause made to read as last given, leaving out the word damaged where it appeared the second time. This amendment was carried by a vote of 48 ayes against 15 nays. It will be perceived at a glance that this change made by the convention in this clause of the Constitution was a most important one, and that it was made after the most careful consideration. The committee of the whole changed the report of the committee on the Bill of Rights. By the report of the committee on the Bill of Rights a marked difference was made between the case, where a company incorporated for the purpose of internal improvement took private property, and where they did not take it but only damaged it. In the one case they had to pay a just compensation to the owner, and in the other they had to pay it or secure it to be paid before they took the property. But in the last case which they had to pay damages done to property, they were not required to pay such damages before the same arose, that is, before they took possession of the adjoining property and did upon it the work, from which the damages might arise.

The committee of the whole placed persons whose property was damaged on the same footing as persons whose

property was taken, and required the company which damaged a person's property but did not take it to pay them damages in advance or secure them to be paid. But after full consideration the convention, by a vote of more than three to one, changed in this respect the report of the committee of the whole, recognizing this marked difference made between persons whose property was taken and those whose property was not taken but merely damaged. With reference to persons, whose property is taken without just compensation being either paid or secured to be paid, our courts were obviously, in every case, compelled to grant injunctions against the internal improvement company till the just compensation was paid or secured to be paid, as in no other possible manner could this constitutional provision be enforced. But with reference to persons whose property is damaged but not taken, and who while entitled to the damages they sustain are by the express provisions of this Constitution not so entitled as of right in advance of their sustaining the damage, nor entitled as of right to have compensation secured in advance of the damages being sustained it is obvious, that as a general rule they must wait till the damages are sustained, and if they are not then paid, they must sue the improvement company doing the damage in a court of law, the appropriate tribunal to try cases, in which damages are claimed for injuries. To entitle them to go into a court of equity asking for a perpetual injunction against the building of an internal improvement, where it is proposed to be built or to enjoin the building of such internal improvement, where it injures them till the amount of the damages have been ascertained and paid, or till the company has given bond and security to pay all damages, which may thereafter be assessed against them for permanent injuries to their property, some facts must exist which render the common law remedy obviously inadequate.

No doubt cases may arise in which injunctions of each of these characters ought to be granted. If for instance a railroad company was authorized to build its road through the street of a town, and could as well build it on one side of the street as on the other, but if built on one side it would damage no one while if built on the other it would inflict serious

damage on a certain person's property. There can be no doubt but that in such cases a court of equity would perpetually enjoin the railroad company from building the road on the side of the street where this damage would be done, if they were about to do so. See *London, &c. R. R. Co.* v. *Canal Co.*, 1 Ry. Cas. 225. So too, if a railroad company having a right to build its road through a street could build it in no other manner than by throwing up an embankment immediately in front of the dwelling-house of a certain person and the embankment was necessarily so high and so close to his dwelling-house that it was impossible to get into it at all, and the entire value of the dwelling-house was destroyed, as much so as if it had been bodily taken by the railroad company and its track built upon its site, the court doubtless would not in such a case perpetually enjoin the railroad from building its road as it proposed to build it, but would enjoin it from building its road against this person's house in this manner, till the damages which he would sustain had been ascertained and the amount paid to him. For in such case though his property was not literally taken by the railroad company, yet its entire value would be obviously destroyed, and he would be injured to the same extent as if it had actually been taken by the railroad company. And this being the case it would obviously be equitable and right to require the damages to be paid in advance, just as would be done if the house had been literally taken. The spirit of the Constitution in this extreme case could only be carried out by requiring the damages to be estimated and paid before the injury was done. The party ought not to be turned out of his house till he had actually recovered the money wherewith to buy another. This was the principle, on which this Court acted in the case of *Mason* v. *The Harper's Ferry Bridge Co. et al.*, 17 W. Va. 396. Mason owned a ferry of large value, estimated by a jury afterwards to be worth ten thousand dollars. He had attached to this ferry as a franchise an exclusive right to transport by this ferry wagons, persons, &c., across the Shenandoah river for a distance of a half mile above and below this ferry. The Harper's Ferry Bridge Company, in violation of this exclusive right of Mason, proposed to build and commenced building

a toll-bridge across the Shenandoah river within less than half a mile of this ferry. The obvious effect of this bridge, when completed and opened as a toll-bridge, would have been to totally destroy all the value of Mason's ferry, as much so as if they had built the bridge over his ferry. For after the completion of the bridge it was obvious, that all wagons, persons, &c. would pass over this bridge rather than over Mason's ferry. It was obvious therefore, that though worth some eight hundred dollars a year net of expenses it would have been worth nothing after the building of this bridge, as thereafter it would not pay the expenses of running it. Mason under these circumstances claimed that his ferry franchise was taken. Judge Johnson on page 419 of 17 W. Va. in reference to this after citing some cases, in which it was held that the total destruction or even the partial destruction or diminution of value is the *taking* of private property says: "But it seems to me there is no taking of the franchise here. The plaintiff still has his right to use his ferry and solicit and obtain all the patronage he can; it is not proposed to prevent him from collecting tolls, and using his ferry just as he did before. But his private property will be very seriously damaged, no doubt." This Court in that case regarded the building of this bridge in its effect on the plaintiff's property, his ferry franchise, as equivalent to a complete taking of it, though as above stated it was not technically taking said property; but as the value of the property was entirely destroyed an injunction was awarded restraining the bridge company from constructing and using this bridge until compensation was paid to the plaintiff for the damages to his ferry franchise, which the court ordered to be ascertained by an issue of a *quantum damnificatus.*

There was an agreement in writing in that case whereby this bridge, pending the controversy, was finished and used by the bridge-company; this agreement was a temporary arrangement, which was not to affect the rights of any of the parties. It is referred to on page 421. The only real question in controversy in that case was, whether Mason was entitled to damages for the destruction of his ferry-franchise. It was totally immaterial to the parties, whether their damages were ascertained in a suit at law or in this suit at chan-

cery.  This indifference of the parties doubless accounts for some careless language used by Judge Johnson in the case. The real points decided in the case were, that Mason was entitled to damages for the injury to his ferry-franchise, and as it practically amounted to a destruction of its entire value and was in effect though not technically such a taking of the franchise that the value of this franchise, a just compensation, should be ascertained and paid before the Harper's Ferry Bridge Company should be allowed to use the bridge.

The decisions in Illinois, where there is a constitutional provision similar to ours, sustain the conclusion which I have reached, that except under peculiar circumstances a court of equity will not enjoin a railroad company from making its road through a street, where it has received proper legislative consent to its so doing, till the damages, which it may do lot-owners on such street, are ascertained and paid or secured to be paid.  The Constitution of Illinois adopted in 1870 had in it this provision: "Private property shall not be taken or damaged for public use without just compensation. Such compensation when not made by the State shall be ascertained by a jury, as shall be prescribed by law.  The fee of lands taken by railroads without the consent of the owner thereof shall remain in such owner, subject to the use for which it was taken."  Under this provision of their Constitution the court of appeals decided in *Stetson* v. *The Chicago and Evanstown Railroad Co.*, 75 Ill. R. 74, that "where a railroad company under authority from a city or town has located its road upon a public street or on other lands not belonging to the complainant, and is constructing the same on which to operate its trains, a court of equity will not entertain a bill to restrain the operating of the road until the complainant's damages to lots owned by him abutting on the street are ascertained and paid, but will leave him to his remedy at law."  It will at once be perceived, that, as the Illinois Constitution made no distinction between persons, whose lands were taken, and those whose lands were damaged, as ours does, that there would be much more difficulty in their courts holding, as they do, that an injunction would lie for a person, whose lands were taken, till his just compensation was secured and paid, but no such injunction

would lie for a person, whose lands were not taken but merely damaged, than there would be in our courts. For, as we have seen, our Constitution evidently contemplates that such distinction shall be made.

Yet excellent reasons are given by the Illinois court for this distinction. Among these reasons is this, that a railroad company ought not to be bound to stop and litigate the question of damage with every one who may claim to be injured. The English cases on a statute similar to this provison of the Illinois Constitution have been construed as not authorizing an injunction, where lands were not taken but merely damaged. The reason given is the impracticability in many cases of knowing whether damages will be sustained or not and of measuring them if they were certain. The court in that case says: "Where the party has settled his right to damages in a court of law and ascertained their measure, if any reason exist why he cannot have execution of the same, equity will assist him but not before. *Dunning* v. *The City of Aurora*, 40 Ill. 481, and *Bliss* v. *Kennedy*, 43 Ill. 67;" see 75 Ill. R. p. 80.

So in *The Peoria* & *Rock Island R. R. Co.* v. *Peter Schertz et al.*, 84 Ill. 135, the court held: "A court of equity will not assume jurisdiction to enjoin the use of a railroad track upon a public street until the adjoining lot-holders' damages shall have been assessed and paid, and this though the railroad company may be insolvent." With reference to this question of insolvency the court on page 440 says: "When the plaintiff has settled his right to damages and ascertained the measure, if any reason exists on account of insolvency, why he cannot have execution of the same, equity will then assist him by injunction or otherwise but not before." In reference to this suggestion I would say, that it occurs to me, that while this may be very reasonable as a general rule, there may be cases where an injunction would be granted because of the insolvency of the company, where, for instance, it could be truthfully alleged, that there was no probability that they or any one else would ever complete the road; or it might be proper to grant an injunction, if the road ran through more than one State and was insolvent and a receiver would probably be appointed by a federal court, as in

such case an injunction could not be granted after the damages were ascertained, as the road might then be in the hands of a federal receiver.

The only other State that I know of, which has a provision in its Constitution similar to that of Illinois and West Virginia is Colorado. Its Constitution declares, that private property shall not be taken or damaged for public or private use without just compensation. The only decision I have seen under this clause of this Constitution, is *Mulladin* v. *Union Pacific R. R. Co.*, found in vol. 15 of the Reporter. The decision was, that the owners of lots abutting on a city street are entitled to compensation for the damages to their property by the use of the street by a railroad company. This was a common law suit. The conclusions reached correspond with the conclusions I have reached.

For the reasons I have stated I am of opinion that the order made in vacation in this cause on July 10, 1883, refusing to dissolve the injunction granted in this cause by said judge on April 16, 1883, must be reversed, set aside and annulled, and the appellant must recover of the appellee, Susan V. Spencer, its costs in this Court expended; and this Court proceeding to render such a decree as the said circuit judge should have rendered, doth sustain the motion of the defendants to dissolve said injunction, and the said injunction is hereby wholly dissolved; and as the bill is wholly a bill seeking such injunction, it should be dismissed at the next term of the circuit court of Mason county with costs to the defendants, unless sufficient cause be shown against such dismission pursuant to section 13 of chapter 133 of the Code of West Virginia; and this cause is remanded to the circuit court of Mason county to be thus proceeded with and to be further proceeded with according to the rules governing courts of equity.

REVERSED.  REMANDED.