# CHARLESTON.

G. K. DICK *v.* CITY OF HINTON *et al.*

(No. 6908)

Submitted November 18, 1930.   Decided November 25, 1930.

*P. J. Carr, R. F. Dunlap* and *W. A. Brown,* for appellant City.

*C. W. Strickling* and *Fitzpatrick, Brown & Davis,* for appellant Chesapeake & O. Ry. Co.

*Martin & Martin* and *Kyle D. Harper,* for appellee.

HATCHER, JUDGE:

Plaintiff brought this suit in June, 1929, for himself and for other property owners similarly situated, to enjoin defendants, City of Hinton (hereinafter called the City) and Chesapeake and Ohio Railroad Company (hereinafter called the C. & O.) from closing "the Avis crossing," (the grade crossing of Main Street of the City over the C. & O. tracks). An issue out of chancery was directed and tried on the question of anticipated damages to plaintiff's property and business, if the crossing were closed. The jury returned a verdict of $2,000.00 in favor of the plaintiff. The trial court then entered a decree perpetually enjoining defendants from closing the crossing until the $2,000.00 was paid the plaintiff, or the City had passed an ordinance for the purpose of paying him. Defendants appealed.

The bill alleges the chartering of the City, the establishment of Main Street, the construction of the C. & O. railroad and

the ownership by plaintiff of a lot on Main Street about 80 feet from the Avis crossing; that there is erected on his lot on the established location and grade of Main Street a two story building costing $5,000.00, the first floor being used as a storeroom, and the second floor being used for dwelling purposes; that his total investment, there, is $13,500.00; that his monthly sales average $1,800.00, and "his monthly income" approximates $400.00; that 75% of his customers live on the opposite side of the railroad from his store, and that in order to trade at his store they necessarily cross the tracks at the Avis crossing; that there is no other way of ingress and egress to his property except by Main Street; that his lot and building are not suitable for any other purposes than their present use and that if the crossing is closed, ingress and egress to his store will be cut off in one direction, his present business will be destroyed, and his investment will become a total loss; that on February 1, 1928, the City and the C. & O. entered into an agreement to build an overhead bridge at the Avis crossing (Exhibit No. 2 with the bill); that a bond issue election (the call therefor is Exhibit No. 3) was carried in the City on April 17, 1928, setting apart $75,000.00 to be expended on the bridge; that on April 27, 1928, the plaintiff and others filed with the mayor and the manager of the City and with the C. & O., written protests against closing the crossing, and that the plaintiff has at all times protested the same; that the bridge was built 335 feet north of the crossing, is practically completed and will be open for travel in ten days, and that the City and the C. & O. are threatening and intending to close the crossing when the bridge is opened, according to the provisions of the agreement of February 1, 1928; that the City has contracted with the C. & O., in disregard of the interest of the plaintiff and the general public, to sell to the C. & O. for $75,000.00 all of the public's interest and right to the crossing, without compensating the plaintiff, or anyone else similarly situated, for his injury, as would appear from Exhibits No. 2 and 3. The bill prays that the defendants, etc., be enjoined from carrying out "said contract" and restrained from closing the crossing.

Exhibit No. 2 recites that the City had submitted a plan of

the State Road Commission for a bridge at the Avis crossing, which was estimated to cost $150,000.00, and the C. & O. had agreed to assume one-half of that cost not to exceed $75,000.00, subject to certain provisions, one of which was that the City would close the Avis crossing.

Exhibit No. 3 is an order made by the affirmative vote of the entire membership of the City Council, a portion of which order follows: ''That it appears to the Council of the City of Hinton, and the Council doth accordingly find, that it is necessary that improvements be made in the City of Hinton as follows: That a bridge and approaches thereto separating the grade crossing at Main Street over the Chesapeake & Ohio Railway Company's tracks, be constructed, erected, built, furnished and equipped in accordance with the plans and specifications of the State Road Commission, which bridge and its approaches will cost approximately $150,000.00, including property damage, and of which total cost the Chesapeake & Ohio Railway Company will pay one-half, or $75,000.00, by agreement, and the City of Hinton will pay the other one-half.''

· The learned trial court (in a written opinion) took the following view: ''The taking of an easement which materially damages the dominant estate is the taking of property. * * * The approaches to the plaintiff's lot on the public street were easements appurtenant thereto, and to deprive the plaintiff of one of the approaches to his property by closing and vacating Main Street and prohibiting traffic thereon, and materially injuring the same, is a taking of the plaintiff's property, in the eyes of the law.'' The easement referred to by the court is commonly termed the right of ingress and egress. This easement is the special and absolute right of an abutter on a street. 4 McQuillin, Municipal Corporations; (2nd Ed.), sec. 1425 (1321). It has been classified as property. 29 C. J., subject Highways, sec. 263; 2 Elliott, Roads and Streets, (4th Ed.), sec. 1180; *Dudding* v. *White,* 82 W. Va. 542, 545; *Fruth* v. *Board,* 75 W. Va. 456, 460-1. And being private property, it cannot be taken from the abutter or damaged, under the constitution, ''without just compensation'' See generally, McQuillin, *supra,* sec. 1426; 13 R. C. L., subject Highways, sec.

125; Elliott, *supra,* sec. 891. (The foregoing statement is meant to be abstract and not to adjudicate that plaintiff is entitled to damages).

The plaintiff's theory is different in terms from that of the circuit court. As gathered from his brief, it is that he would suffer special and peculiar injuries from the closing of the crossing, not common to the public at large; that such injuries would amount to a taking of his property, and that he is there-. fore entitled to have the closing of the crossing enjoined until his damages shall have been paid or secured to be paid.

Both theories are essentially defective in premising that the plaintiff's property is *taken.* Right of access to property, in an abstract sense, is integral and is not composed of directional divisions. That right may be substantially impaired; but it is not taken away until ingress and egress are completely barred. The obstruction of access in one direction may be a damage to an abutter on the highway; but unless his access is obstructed in both directions, his easement is not destroyed. Likewise, unless the consequential injuries to property from obstructing a street destroy its value as effectually as if it had been actually appropriated, there is no *taking* of the property. Failure to observe these distinctions led the trial court into error. It is only in case of *the taking of property* (either actually or by destruction of its value) that equity may enjoin the use of the property until compensation is paid or secured. We are not unmindful that the bill here alleges a total destruction of the value of plaintiff's property; but the facts pleaded, do not support the allegation. When property is not taken or destroyed by a public use, but is merely damaged, as alleged in this case, the owner must resort to the law courts for the recovery of compensation, and is not entitled to an injunction. This distinction arises from the particular phraseology of our Constitution, Article III (Bill of Rights) sec. 9, which is as follows: ''Private property shall not be taken or damaged for public use, without just compensation; nor shall the same be taken by any company, incorporated for the purposes of internal improvement, until just compensation shall have been paid or secured to be paid, to the owner; and when private property shall be taken, or damaged for public use, or for the use of

such corporation, the compensation to the owner shall be ascertained in such manner, as may be prescribed by general law: Provided, that when required by either of the parties, such compensation shall be ascertained by an impartial jury of twelve-freeholders.''

As the Constitutions of many of the states differ from ours in respect to compensation for taking or injuring private property for public use, the citation by counsel of decisions from the states at random, serves but little purpose. Colorado and Illinois were the only states with provisions like ours in 1884, according to JUDGE GREEN in *Spencer* v. *R. R. Co.*, 23 W. Va. 406, 447. The list was still in the minority in 1906. See *Vanderburgh* v. *City*, 98 Minn. 329, 331. The history of our constitutional provision is given by JUDGE GREEN in the *Spencer* case, pp. 440, 441, 442. We quote from the last page the procedure, which is the outgrowth of this provision:

> ''With reference to persons, whose property is taken without just compensation being either paid or secured to be paid, our courts were obviously, in every case, compelled to grant injunctions against the internal improvement company till the just compensation was paid or secured to be paid, as in no other possible manner could this constitutional provision be enforced. But with reference to persons whose property is damaged, but not taken, and who while entitled to the damages they sustain are by the express provisions of this Constitution not so entitled as of right in advance of their sustaining the damage, nor entitled as of right to have compensation secured in advance of the damages being sustained it is obvious, that as a general rule they must wait until the damages are sustained, and if they are not then paid, they must sue the improvement company doing the damage in a court of law, the appropriate tribunal to try cases, in which damages are claimed for injuries.''

The distinction drawn in the *Spencer* case was confirmed in *Arbenz* v. *Ry. Co.*, 33 W. Va. 1; *Yates* v. *Grafton*, 34 W. Va. 783; *Ward* v. *R. R. Co.*, 35 W. Va. 481, 485.; *Bartlett* v. *Chemical Co.*, 92 W. Va. 445, 452-3; *Martin & Shaffer* v. *Martins-*

*burg*, 102 W. Va. 138, 144. If any procedure in this jurisdiction is definitely settled, that pronounced by JUDGE GREEN, above, should be so regarded. The very course attempted in this suit by plaintiff (including the issue out of chancery on the question of damages) was disapproved in *Ohio River Co.* v. *Gibbens*, 35 W. Va. 57, the court saying on page 59:

> "We have two cases of our own directly in point: *Spencer* v. *Railroad Co.*, 23 W. Va. 406, in which the subject is discussed by the late JUDGE GREEN with his great store of legal learning and his power of patient and indomitable research; *Arbenz* v. *Railroad Co.*, 33 W. Va. 1 (10 S. E. Rep. 14) in which JUDGE SNYDER unfolds and makes plain the spirit of our statute on the subject, and that it is fully up to and abreast with the progress of the age. See Chapter 54, Code W. Va., especially section 50, page 518. The meaning of it is that it is a vain and idle thing for any one man to plant himself by injunction squarely in front of such progress. He must seek his remedy by way of damages or other mode of compensation. This, the courts in some places now have power to give him, notwithstanding his mistake of proceeding by injunction; but in pleading and practice we have not yet reached that point."

Laches, as well as *stare decisis*, forbids this suit. Plaintiff knowingly stood by while the C. & O. spent the large sum of $75,000.00 and his fellow citizens a like sum for the very purpose of dispensing with the crossing. It is true he protested. But a protest was not sufficient. The courts were just as open to him to redress any anticipated injury in 1928, as they were in 1929. It would not be equitable, now, to have this grade crossing maintained, with its inherent element of danger to the public, merely to await the adjustment of plaintiff's claim for damages. *Batson* v. *Ry. Co.*, 106 S. C. 307; *Poythress* v. *Ry. Co.*, 92 Miss. 638; *Wees* v. *Ry. Co.*, 54 W. Va. 421 (pt. 5 Syl.).

In *Dudding* v. *White, supra*, cited by plaintiff, the vacation of a county road was enjoined because the county court had not proceeded in manner required by law. There is nothing in the bill here showing that the City has not proceeded, or

would not proceed, in a lawful manner, in closing the crossing. In *Mason* v. *Bridge Co.*, 17 W. Va. 396, point 3 of the syllabus does support, abstractly, the plaintiff's procedure. But that case was reconciled by subsequent decisions only on the theory that the property was "entirely destroyed in value as effectually as if it had been actually taken." See the *Spencer* case, pt. 3 of the syllabus. (The same observation applies to another citation, *Colliery Co.* v. *Harding*, 83 W. Va. 609). In other cases relied on by plaintiff, the property was actually taken or some other material difference from this suit is manifest.

As the law gave the circuit court no jurisdiction to proceed in this case, the orders and decrees herein must be reversed, the issue out of chancery, and the finding of the jury therein be set aside, the injunction dissolved and the cause dismissed, but without prejudice.

*Reversed; injunction dissolved; dismissed.*